UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-CR-0195-004-CVE |
| ) | |
| STEVEN FISHMAN, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is the Motion of Defendant Steven Fishman to Dismiss the Indictment as Being Fruit of Effectively Immunized Statements (Dkt. # 93). Defendant asks the Court to dismiss the charges against him, because he voluntarily cooperated with government officials during their investigation with the belief that he would not be charged with a crime. The government responds that defendant did not have an express or implied agreement concerning future prosecution and defendant did not request or receive any type of immunity for his cooperation. The Court granted defendant's request for an evidentiary hearing on this motion, and a hearing was held on March 2, 2009.

**I.**

On November 30, 2007, defendant Steven Fishman and others were charged in a sealed indictment with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 (Count One) and conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1856(h) (Count Two). Fishman filed several motions to dismiss, including a motion (Dkt. # 93) seeking dismissal of the indictment on the ground that he voluntarily cooperated with federal investigations in the Central District of Illinois and the Northern District of Oklahoma and he believed that he would be

immune from prosecution due to his cooperation. On March 2, 2009, the Court held an evidentiary hearing on defendant's motion. At the hearing, defendant offered the testimony of three witnesses and testified on his own behalf.

Darilynn Knauss is an assistant United States Attorney in the Central District of Illinois, Peoria Division. She testified that Fishman provided information about a fraudulent scheme to sell historical railroad bonds. The alleged leader or organizer of the scheme was Peter Zaccagnino and Fishman allegedly worked as Zaccagnino's secretary from 1998 to 2001. Fishman testified before a grand jury in the Central District of Illinois during the government's investigation of Zaccagnino, but Fishman did not raise his Fifth Amendment right against self-incrimination at any point during his grand jury testimony. Knauss stated that Fishman was not a target of the investigation and he was treated as a fact witness. Knauss did not grant Fishman any kind of immunity during the investigation. She spoke to an assistant United States Attorney in the Northern District of Oklahoma, Kevin Leitch, about Fishman, but she made no recommendation about whether Fishman should be prosecuted in another district for his conduct.

Michael Bandy, a retired criminal investigator for the Internal Revenue Service (IRS), testified about his contact with Fishman during the government's investigation of Zaccagnino. He acknowledged that Fishman's cooperation was helpful during the investigation, and he made notes of several of his phone conversations with Fishman. Defendant's Ex. 2. The phone calls identified in Exhibit 2 occurred between July 16, 2002 and April 28, 2003, but Bandy may have begun talking to Fishman before July 16, 2002. Some of the information provided by Fishman concerned an organization known as Caribou Capital Corporation (Caribou Capital), and Bandy learned that a United States Postal Inspector in the Northern District of Oklahoma, Albert Chapa, and an IRS

agent, Katherine Beckner, were investigating Caribou Capital in connection with a fraudulent investment scheme. Bandy talked to Chapa and Beckner, and he disclosed Fishman's cooperation. Bandy testified that he did not advise Fishman in any manner about whether Fishman should cooperate with investigators in the Northern District of Oklahoma. Bandy talked to the United States Attorney's office in the Central District of Illinois about Fishman's cooperation, and he understood that Fishman would not be prosecuted in that district. Bandy testified that he did not grant any immunity to Fishman, nor did he suggest that Fishman would not be prosecuted in any other judicial district. He testified that the lacks the power to provide immunity to a witness or make any binding promises concerning future prosecution.

Chapa testified at the evidentiary hearing about his contact with Fishman. Chapa learned of Fishman's identity by reviewing documents seized from Lynn Thornburgh's residence in March 2003 and the seized evidence included contact information for Fishman. Chapa testified that he contacted Fishman and he was initially unaware that Fishman was cooperating with a federal investigation in the Central District of Illinois. On May 8, 2003, Chapa spoke to Fishman on the telephone and asked Fishman if he knew Peter or Gigi Zaccagnino. Based on Fishman's response, he assumed that Fishman was cooperating with the investigation, but he did not confirm Fishman's cooperation with the Zaccagnino investigation until January 2005. Chapa asked Fishman if he would voluntarily turn over documents relating to Caribou Capital. From May 2003 to August 2006, Fishman voluntarily produced documents in his possession concerning Caribou Capital. Chapa

estimates Fishman produced approximately 5,000 documents and all of the documents were produced before a grand jury subpoena was ever issued.[1]

Fishman or his father, Jack Fishman, owned historical railroad bonds that were seized during the execution of a search warrant on Safekeeping Depository of America in Clovis, California in April 2003.[2] Fishman began requesting the return of his historical railroad bonds during his communications with Chapa. On October 27, 2003, assistant United States Attorney Charles McLoughlin agreed to release the bonds to Fishman pursuant to a written agreement. Defendant's Ex. 3. Fishman agreed to personally retain possession of the bonds and he also agreed to make the bonds available to investigators if it should be deemed necessary. Id. at 1. Fishman later returned the bonds to Chapa in August 2006 upon Chapa's request. Chapa testified that he told Fishman that returning the bonds would be an act of good faith and Fishman voluntarily returned the bonds.

Fishman received a subpoena to testify before a grand jury of the Northern District of Oklahoma on June 7, 2004. Dkt. # 93, Ex. 2. The scope of that subpoena was limited to Fishman's knowledge of an alleged threat made against Chapa by Thornburgh. The subpoena did not contain an advice of rights, and Fishman was not the target of that investigation. Fishman agreed to work with investigators in an attempt to record Thornburgh making a threat against Chapa, but his

---

[1] Fishman testified that he produced at least seven to eight thousand documents to Chapa. For the purpose of ruling on this motion, the number of documents produced is not material and the Court simply notes the discrepancy between Fishman's and Chapa's testimony.

[2] There is conflicting evidence concerning the owner of the bonds. Chapa testified that defendant represented that the bonds belonged to Jack Fishman, and Jack Fishman wanted to maintain possession of the bonds. Defendant testified that he has been the owner of the bonds since 1983.

attempts to obtain a recording were unsuccessful. Chapa testified that he met with Fishman in June 2004 but he did not discuss the investigation that resulted in the indictment in this case.

Fishman received a second subpoena, dated August 24, 2006, to appear before a grand jury in the Northern District of Oklahoma on September 5, 2006, but this was a target subpoena containing the following advice of rights:

## ADVICE OF RIGHTS

1. The Grand Jury is conducting an investigation of possible violations of federal criminal laws.

2. You may refuse to answer any questions if a truthful answer to the question would tend to incriminate you.

3. Anything that you do say may be used against you by the Grand Jury or in a subsequent legal proceeding.

4. If you have retained counsel, the Grand Jury will permit you a reasonable opportunity to step outside the Grand Jury room to consult with counsel if you so desire.

5. **You are notified that you are a target of an investigation for possible violations of federal criminal law.**

Dkt. # 93, Ex. 1 (emphasis added). That same day, Fishman sent an e-mail to assistant United States Attorney Kevin Leitch stating:

> I tried to reach you several minutes ago in order to discuss the Advice of Rights that is on the subpoena. I have been cooperating fully with your office by sending you all of the documents I have ever had, and I do not intend to retain any counsel nor do I feel that I need to do so. I hope that once your office has had the opportunity to review all of the evidence I have supplied and once I have answered your questions and have had the opportunity to testify openly and honestly before the Grand Jury, than I hope and pray that I will no longer be viewed as a target or as an adversary in any way. I am trying my best to provide whatever assistance I can.

Defendant's Ex. 5, at 8. Fishman appeared before the grand jury on September 6, 2006, and declined to invoke his Fifth Amendment right against self-incrimination. He did not receive immunity for his testimony from the assistant United States Attorney or otherwise provide compelled testimony, and Chapa testified that he lacked the authority to offer a witness or target in the investigation any type of immunity.

Chapa testified that, throughout the investigation, Fishman was concerned about his potential status as a target and Fishman repeatedly asked if he would be charged with a crime. Chapa stated that this is a common question from witnesses and he has a standard speech he recites when this issue arises. Chapa informs any witness, as he did with Fishman in this case, that law enforcement officials do not have authority to make "deals" and any deal offered by a law enforcement official should not be trusted. He testified that he did not make any promises to Fishman concerning his cooperation or offer to make a deal to limit Fishman's criminal liability.

Fishman made another trip to Tulsa in February 2007 to meet with Chapa and assistant United States Attorneys Kevin Leitch and Charles McLoughlin, and possibly to testify before the grand jury again. At a meeting with Leitch and McLoughlin on February 9, 2007, Fishman was handed a letter notifying him that he was a target of a federal investigation. The government has produced notes from the meeting and it is clear that Fishman's status in the investigation was no longer in doubt. According to the notes, McLoughlin informed Fishman that he would be charged with a crime and Fishman indicated that he still wanted to cooperate. Government Ex. 2. McLoughlin did not make any promises concerning the charges that would be filed against Fishman and he did not offer Fishman immunity for his prior statements. Chapa drove Fishman to the Federal

Public Defender's office in Tulsa and counsel was appointed to represent Fishman during the remainder of the investigation. Fishman did not testify before the grand jury in February 2007.

Fishman testified that he believed he would not be prosecuted because he fully and voluntarily complied with requests for cooperation. He states that he initially decided to cooperate to prevent Peter Zaccagnino from perpetrating a massive fraud. Fishman claims that Chapa contacted him in May 2003 about an investigation in the Northern District of Oklahoma. He states that Bandy advised him to fully cooperate with Chapa. Fishman asserts that he complied with requests for documents without the need for a grand jury subpoena. When Chapa asked Fishman to return the bonds in 2006, Chapa allegedly told Fishman that this would be treated as an "act of good faith," and Fishman returned the bonds to Chapa. Fishman claims that McLoughlin stated that he would not prosecute "Clancy" or "Jensen," even though they were allegedly targets of the investigation, and this led Fishman to believe that he would not be prosecuted. Fishman admitted that he did not invoke his Fifth Amendment right against self-incrimination in any grand jury proceeding, even after he received a target subpoena, because he believed that it would be a "formality." However, he acknowledged that no one connected with the investigation in the Northern District of Oklahoma offered him immunity or promised that he would not be prosecuted.

**II.**

Defendant claims that any statements he made to law enforcement officials and his grand jury testimony were "effectively immunized," because he voluntarily cooperated with an ongoing investigation and reasonably believed any evidence he provided would not be used against him. Dkt. # 93, at 2. However, there is no evidence that anyone offered defendant immunity, and even defendant acknowledges that he did not believe he had received an express grant of immunity.

Instead, defendant's argument is based on his belief that his cooperation would impliedly afford him immunity from prosecution, even without an express cooperation agreement with the government.

Defendant relies on Kastigar v. United States, 406 U.S. 441 (1972), to support his argument that the government should be required to show that it did not rely on "effectively immunized" testimony as a basis for charging him with a crime. However, defendant's situation is clearly distinguishable from Kastigar. Kastigar involved a case where two witnesses were subpoenaed to appear before a grand jury and the prosecution believed it was likely that the witnesses would assert their Fifth Amendment privilege against self-incrimination. Id. at 442. The government anticipatorily granted both witnesses use immunity, but the witnesses still refused to answer questions before the grand jury. The government filed a motion to compel the witnesses to testify, and both witnesses were brought before the district court. The district court held both witnesses in contempt and ordered that the witnesses be detained until they answered the grand jury's questions or the term of the grand jury expired. Id. The Supreme Court considered the protection afforded by the Fifth Amendment privilege against self-incrimination when the government provides a witness with use immunity for the purpose of testifying before a grand jury. Without use immunity, the witnesses would have had a Fifth Amendment right to remain silent and could not have compelled to testify. Id. at 453-54. However, the government chose to give each witness use immunity for any statements made before the grand jury and this prevented the government from using compelled testimony against either witness. Id. at 453. Use immunity adequately protects a grand jury witness' right against self-incrimination, because the government may not use any testimony provided under a grant of use immunity as a basis to charge a person with a crime. Id. ("Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly

therefrom, affords this [Fifth Amendment] protection."). Should the government choose to prosecute a witness who testified before the grand jury with use immunity, the government has the burden to prove that it relied on evidence "derived from a legitimate source wholly independent of the compelled testimony" to file criminal charges against the defendant. Id. at 461.

Inherent in Kastigar and made clear by subsequent Tenth Circuit decisions is defendant's burden to make an initial showing that he gave compelled testimony pursuant to a grant of immunity before the burden shifts to the government to show it relied on evidence wholly derived from an independent source to charge defendant with a crime. Kastigar, 406 U.S. at 460-61; United States v. Lacey, 86 F.3d 956, 972 (10th Cir. 1996); Grand Jury Subpoeanas Dated December 7 and 8 v. United States, 40 F.3d 1096, 1101 n.4 (10th Cir. 1994). Defendant has attached two separate grand jury subpoenas to his motion as evidence that he cooperated with the United States Attorney's office for the Northern District of Oklahoma. However, he has not offered any evidence showing that he invoked his Fifth Amendment right to remain silent during his grand jury testimony on either occasion or that he was granted immunity prior to or during his grand jury testimony. If defendant testified before the grand jury and did not raise his Fifth Amendment privilege, he waived his Fifth Amendment privilege and his grand jury testimony may be used against him. See Garner v. United States, 424 U.S. 648 (1976) (testimony is not compelled if a witness fails to raise his or her Fifth Amendment privilege). Defendant states that he believed asserting his Fifth Amendment right against self-incrimination was an unnecessary "formalilty," but his silence constituted a waiver of his Fifth Amendment privilege. Therefore, the Fifth Amendment privilege against self-incrimination does not apply and defendant's grand jury testimony could be used to charge him with a crime.

Defendant also cites statements made by Chapa and McLoughlin that allegedly caused him to believe that he would not be prosecuted, and he claims that he cooperated with the understanding that his statements would not be used against him. He claims that Chapa referred to his voluntary return of the historical railrod bonds as an "act of good faith." McLoughlin allegedly told defendant that "Clancy" and "Jensen" would not be prosecuted, and defendant inferred from this statement that he would not be prosecuted. This evidence does not suggest that defendant reached an express or implied immunity agreement with the government. Defendant received a target subpoena to testify before the grand jury on September 5, 2006, and this should have alerted defendant that he was no longer just a fact witness. Even after receiving a target subpoena, defendant did not raise his Fifth Amendment privilege or request a grant of use immunity from the government before testifying on September 6, 2006. The transcript of defendant's grand jury testimony shows that Leitch advised defendant of his rights at the beginning of defendant's grand jury testimony and Leitch made no agreement with defendant concerning his testimony. Government Ex. 1. After defendant continued to ask about his status in the investigation, Chapa declined to make any deals with defendant. This is consistent with Chapa's testimony that he lacked authority to enter any agreements with a witness concerning future prosecution, and there is no evidence that Chapa made any representation to defendant that could have been interpreted as an offer of immunity or a plea bargain. In February 2007, defendant received a target letter from the United States Attorney's office for the Northern District of Oklahoma, and McLoughlin and Leitch discussed the possibility of a plea deal with defendant. Government Ex. 2. However, there was no discussion that defendant would be immune from prosecution based on his cooperation.

Defendant's subjective belief that he would not be prosecuted simply because he cooperated with the investigation was unreasonable, and he has not made a prima facie showing that he had any type of agreement with investigators or the United States Attorney's office that would prevent him from being charged with a crime in this case. Defendant was not compelled to testify before the Grand Jury and Kastigar does not apply. There is no credible evidence that defendant had an express or implied immunity agreement, nor is there any evidence that defendant entered an agreement with the United States Attorney's office to reduce or eliminate his potential criminal liability. Defendant's claim that his statements and grand jury testimony were "effectively immunized" is not supported by the evidence, and his motion to dismiss should be denied.

**IT IS THEREFORE ORDERED** that the Motion of Defendant Steven Fishman to Dismiss the Indictment as Being Fruit of Effectively Immunized (Dkt. # 93) is **denied**.

**DATED** this 5th day of March, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT