UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CR-0195-004-CVE |
| | ) | |
| STEVEN FISHMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Now before the Court is the Motion for Judgment of Acquittal of Defendant Fishman Pursuant to F.R.C.P. 29(c) (Dkt. # 289). Defendant Steven Fishman moves for a judgment of acquittal as to both counts of the second superseding indictment on the ground that the government failed to prove 17 issues identified in his motion, each of which he claims is critical to a finding of guilt. The government responds that it presented sufficient evidence to establish defendant's guilt beyond a reasonable doubt and none of the issues identified by defendant goes to an essential element of the charged offenses.

**I.**

On November 30, 2007, Fishman and three others were charged in a sealed indictment (Dkt. # 2) with conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349 (Count One) and conspiracy to launder money or engage in monetary transactions involving property derived from unlawful activity in violation of 18 U.S.C. § 1956(h) (Count Two). The indictment alleges that defendant and others "falsely represented to investors that various person in Europe, whose names are known to the Grand Jury, were diligently working to place [] historical bonds into a European bank trading program." Id. at 5. Defendant or his co-conspirators allegedly represented to investors

that they possessed bonds that could be used to obtain a line of credit from European banks, and the line of credit would be used to buy leveraged investments with a guaranteed return for investors.

The indictment was unsealed on August 21, 2008, and defendant made his initial appearance on September 11, 2008. Counsel was appointed for defendant and he was released on bond. The government asked the Court to declare the case a complex case under the Speedy Trial Act, 18 U.S.C. § 3161 et seq. Dkt. # 27. Defense counsel preliminarily reviewed the discovery materials and agreed that it would be unreasonable to require them to prepare for trial within 70 days. Dkt. # 51, at 2. The Court granted the government's motion and set the jury trial for February 17, 2009. The parties jointly requested a continuance of the jury trial due to the volume of evidence, and the Court reset the trial for May 18, 2009. Dkt. # 101. Defendant also filed numerous motions to dismiss, but his motions were denied. See Dkt. ## 138, 162.

The Grand Jury returned a superseding indictment (Dkt. # 196) on April 10, 2009 alleging the same two charges with additional factual allegations. The government requested a continuance of the jury trial and the Court reset the jury trial for June 15, 2009. Dkt. # 225. On May 20, 2009, the Court modified the conditions of defendant's pretrial release to limit his travel and to prohibit defendant from continuing his employment with the Atlas Monetary International Trust. Dkt. # 232. Before trial, the Grand Jury returned a second superseding indictment (Dkt. # 239) asserting the same charges but revising the amounts of certain monetary transfers.

Jury selection was conducted on June 15, 2009, and a hearing was held that afternoon to resolve evidentiary issues outside the presence of the jury. See Dkt. # 260, 264. The parties made opening statements on the morning of June 16, 2009 and, following opening statements, the

government called United States Postal Inspector Albert Chapa as its first witness.[1] Chapa testified about the history of the government's investigation into Fishman's activities. He learned about Caribou Capital Corporation (Caribou Capitol) and the bond trading programs from an investor, Marsha Longaberger, who alleged that she had been defrauded and had lost a substantial amount of money. Caribou Capital solicited investments for alleged bond programs using bonds issued by the Galveston, Houston & Henderson Railroad in the 1850s and bonds issued by the Republic of China in the early 1900s. Chapa reviewed documents showing that Fishman worked with Peter Zaccagnino on a similar bond program before Fishman associated with Robert Searles and Joseph Lynn Thornburgh, and Fishman met Searles and Thornburgh through Zaccagnino. He also reviewed documents recovered from a search of Thornburgh's residence showing that investors paid money to an entity known as Caribou Capital. It is undisputed that Fishman was not an owner or officer of Caribou Capitol. However, the evidence showed that Fishman played an integral part in drafting documents for Caribou Capital, and his knowledge of historical bonds, safekeeping methods, and bond valuation was essential to setting up Caribou Capital and the bond investment programs. Fishman also received a percentage of any funds submitted by investors for placement in a bond program, and documents reflected that this was a substantial amount of money. Over time, the investors' money began to run out and Fishman and his co-defendants began to request additional funds to support them while allegedly working to promote the bond programs. Fishman became aware that the Internal Revenue Service was investigating Caribou Capital and advised his European

---

[1] The trial lasted two weeks and approximately 40 witnesses testified, and the Court will not attempt to summarize the testimony of each witness. Instead, the Court has reviewed an audiorecording of the trial and will summarize the testimony of witnesses providing evidence relevant to Fishman's motion for judgment of acquittal.

3

contact, Patrick Henriette, not to talk to Thornburgh or Searles by telephone, because Fishman believed that the government had obtained a wiretap for their cellular telephone numbers.

During the investigation, Chapa contacted Fishman and Fishman began to provide documents and information concerning Caribou Capital's activities. Fishman selected the documents that were sent to Chapa, and Chapa had no role in deciding which documents would be submitted for the government's review. Fishman voluntarily spoke to Chapa about his activities and, in particular, discussed his relationship with Henriette. Fishman admitted that he drafted documents for Henriette. Although Fishman worked with Henriette to use bonds as a collateral for a loan, Henriette had never been successful and Fishman acknowledged that it was unlikely that Henriette would ever be successful. Fishman told Chapa that he knew the bonds were valuable as collector's items only and had no value as collateral to obtain a loan. Fishman later revised his statements and told Chapa that Henriette simply had not been successful, but Fishman believed a bond program could work. Fishman also discussed his relationship with Norah Cali, who represented that she was the niece of Alan Greenspan, former Chairman of the Federal Reserve Board. Cali allegedly believed that the Chinese bonds were a recognized and valid debt of the Chinese government, and Fishman relied on Cali's statements to assure investors that the Chinese bonds had value. On cross-examination of Chapa, Fishman attempted to show that he cooperated with Chapa under the belief that his cooperation would immunize him from any criminal charges in connection with the bond programs and Caribou Capital. Fishman also attempted to establish that he represented to Chapa that he believed the historical bonds had value and the bond programs would eventually succeed.

George LeBarre testified that he sells collectibles and his inventory includes historical bonds. He sells historical bonds as collectibles only and issues a disclaimer that the bonds have no value

other than as collectibles. He testified that Fishman or an associate of Fishman's would purchase bonds from LeBarre, and the bonds would be shipped to Fishman. LeBarre stated that there was a significant demand for certain historical railroad bonds between 1995 and 2000, but he did not know why there was an increased demand for the bonds during that time.

Zaccagnino, a convicted felon serving a 262 month sentence in federal prison, testified about his prior association with Fishman. He testified that Fishman was his associate and that Fishman's cooperation with the United States Attorney for the Central District of Illinois was central to the government's case against him. Zaccagnino became involved with historical railroad bonds in the summer of 1997, and he purchased seven historical railroad bonds for about $10,000 each. He formed a company called Two Thirds International to place bonds that other customers already owned into a high yield investment program, and he had a contact in Spain who claimed that the bonds could be placed with European banks. Zaccagnino testified that customers began to offer him money for living expenses to pursue these investment programs, and he abandoned his other business interests. He met Fishman in November 1997, and Fishman stated that he had recently purchased some historical railroad bonds. Fishman did not initially place any bonds with Zaccagnino, but their relationship grew when Fishman referred a significant customer to Zaccagnino. Zaccagnino and Fishman became business partners and agreed to share the profits of their venture equally. They received a substantial amount of money from investors and purchased houses, luxury cars, and bulletproof limousines with the investors' funds.

Zaccagnino eventually started to sell historical bonds to customers and was introduced to Searles and Thornburgh. Zaccagnino would pay Searles and Thornburgh commissions for referring customers to him. Zaccagnino learned that his Spanish contact had misrepresented his connections,

and had no ability to place bonds with European banks. Fishman claimed that he had sufficient contacts to oversee the bond programs, and he agreed to draft documents and manage the bond programs for Zaccagnino. Fishman mentioned a French contact who could allegedly place the bonds with European banks. By 1999, Fishman had spent all of his money and he admitted to Zaccagnino that the bonds could not be used to obtain loans from European banks. Zaccagnino testified that he came to the same conclusion and determined that no high yield investment program for historical bonds actually existed. However, they continued to buy bonds from collectors and create fraudulent bond histories, and they sold these bonds or fractional interests in the bonds to customers as if the bonds could be used in a high yield investment program. Fishman contacted Zaccagnino in late 2001 or early 2002 and stated that he had learned that their bond programs were being investigated by the IRS. Fishman stated that he would be severing his ties with Zaccagnino and hiring an attorney to defend himself. Zaccagnino testified that he met with Fishman about a year later, and learned that Fishman and Thornburgh went to Europe in furtherance of bond programs offered by Caribou Capital.

The government read to the jury Fishman's testimony before the Grand Jury in the Northern District of Oklahoma on September 6, 2006. Fishman testified that his father gave him several historical railroad bonds, and Fishman's father asked him to submit the bonds to Dean Witter, where Fishman worked, for review. Dean Witter informed Fishman that the bonds were not valid securities and had no value in a securities market. Fishman described his relations with Zaccagnino and their dealings in historical bonds. He testified that he parted ways with Zaccagnino when Zaccagnino began to promote high yield cash programs instead of bond programs. Fishman explained that he researched the value of historical railroad bonds in 1999, and found that at least two federal agencies

had determined the bonds had no value as a security.  Fishman's bond valuator, John Clancy, informed Fishman that the Bureau of Public Debt had asked him to stop valuing certain historical railroad bonds because the bonds were worthless.  Fishman testified that he dealt with Caribou Capital and its investors, and assisted Searles and Thornburgh with their bond programs.  On several occasions, Fishman reassured investors that their investment was safe and Henriette would come through, but he believed those statements were false when he made them.  He also testified that he told at least one investor not to place any money with Caribou Capital.  During a meeting with Henriette, Searles, and investors, Fishman testified that Henriette claimed the bond programs would support humanitarian causes and this provided credibility to the bond programs in the minds of investors.  Fishman took a trip to Switzerland to promote the historical bond programs and meet with Swiss banks, but the trip was not productive.  When asked why he continued to participate in Caribou Capital's bond programs, he stated that he "always thought maybe there was some hope somehow" and that Henriette would be able to place the bonds with European banks.  However, Fishman testified that it was fair to characterize his testimony to mean that he believed by 1999 that the bond programs would never work.

At the close of the government's case-in-chief, Fishman moved for a judgment of acquittal under Fed. R. Civ. P. 29.  Dkt. # 276.  The Court denied Fishman's motion.  Fishman argued that he withdrew from the conspiracy more than five years before the indictment was filed, and the statute of limitations expired before the indictment was filed.  However, the Court found that the evidence presented a fact issue concerning the statute of limitations and his alleged withdrawal from the conspiracy, and defendant was not entitled to an acquittal due to expiration of the statute of limitations.  Fishman also argued that he was not a member of Caribou Capital and, thus, was not

a member of the conspiracies alleged in the second superseding indictment. The Court determined that the conspiracy alleged in the second superseding indictment was not based solely on membership in Caribou Capital, and there was sufficient evidence for the jury to find that Fishman belonged to a conspiracy as alleged in the second superseding indictment.

Thornburgh did not call any witnesses in his own defense, but Fishman recalled Chapa as a witness and presented the testimony of Henriette by video deposition. Chapa provided greater detail about his meetings with Fishman before the case was filed and the circumstances surrounding Fishman's testimony before the Grand Jury on September 6, 2006. Henriette testified that, based on his historical research, he believed the historical railroad bonds possessed by Caribou Capital were valid debts and could be used as collateral to obtain a loan. He described his dealings with Fishman and Fishman's father, Jack Fishman, concerning the family's historical bonds. Henriette testified that he came to question the representations of Thornburgh and Searles concerning the validity and history of historical bonds owned by Caribou Capital. On cross-examination, Henriette acknowledged that he was never able to use historical railroad bonds as collateral to obtain a loan from a European bank. He further testified that he has learned of a "secret ruling" by the Florida Supreme Court and believes he can present his historical bonds for redemption at the end of 2009. Following Henriette's testimony, the Court read a stipulation to the jury that Fishman attempted to subpoena Clancy as a witness, but Clancy indicated that he would invoke his Fifth Amendment right against self-incrimination and Fishman declined to call him as a witness. Fishman renewed his motion under Rule 29 at the close of his case, but the Court denied his renewed motion.

The Court instructed the jury as to both counts charged in the second superseding indictment and Fishman's defenses to the charges. Fishman argued that the evidence showed that he was not

a member of Caribou Capital, and he was not a member of the conspiracy charged in the second superseding indictment. The Court instructed the jury on Fishman's defense that evidence of a separate conspiracy was not sufficient to prove his guilt unless he was also a member of a conspiracy to commit the alleged charges. Dkt. # 285, at 81. The Court also gave Fishman's proposed instruction on the good faith defense, which stated in part:

> A PERSON WHO ACTS, OR CAUSES ANOTHER PERSON TO ACT, ON A BELIEF OF AN OPINION HONESTLY HELD IS NOT PUNISHABLE UNDER THE STATUTE MERELY BECAUSE THE BELIEF OR OPINION TURNS OUT TO BE INACCURATE, INCORRECT, OR WRONG. AN HONEST MISTAKE IN JUDGMENT OR AN HONEST ERROR IN MANAGEMENT, DOES NOT RISE TO THE LEVEL OF CRIMINAL CONDUCT. HOWEVER, A DEFENDANT'S HONEST BELIEF THAT A VENTURE WILL ULTIMATELY SUCCEED DOES NOT CONSTITUTE GOOD FAITH IF, IN CARRYING OUT THE PLAN, HE KNOWINGLY USES FALSE REPRESENTATIONS OR PRETENSES WITH INTENT TO DECEIVE.
>
> WHILE THE TERM "GOOD FAITH" HAS NO PRECISE DEFINITION, IT ENCOMPASSES, AMONG OTHER THINGS, A BELIEF OR OPINION HONESTLY HELD, AN ABSENCE OF MALICE OR ILL WILL, AND AN INTENTION TO AVOID TAKING UNFAIR ADVANTAGE OR ANOTHER.

Id. at 83-84. Fishman also argued that he withdrew from the conspiracy and the statute of limitations had expired, and he could not be prosecuted for the crimes alleged in the second superseding indictment. Id. at 85.

The jury convicted Fishman of both charges in the second superseding indictment. Fishman has renewed his motion for judgment of acquittal following trial, and asks the Court to set aside the jury's verdict and enter a judgment of acquittal as to one or both counts of the second superseding indictment.

**II.**

Under Fed. R. Crim. P. 29(c), a defendant "may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict . . . ." The Court must determine whether there is sufficient evidence from which a jury could have found defendant guilty beyond a reasonable doubt. United States v. Bailey, 327 F.3d 1131, 1140 (10th Cir. 2003). When ruling on a Rule 29(c) motion, the Court must "view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government," and the jury's verdict should be set aside "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Haslip, 160 F.3d 649, 652-53 (10th Cir. 1998). The Court "may neither weigh conflicting evidence nor consider the credibility of witnesses." United States v. Pappert, 112 F.3d 1073, 1077 (10th Cir. 1997).

**III.**

Fishman argues that the government's evidence simply establishes "mere association" among Fishman, Thornburgh, and Searles, and there was no evidence that Fishman joined a conspiracy to defraud investors through any type of bond program. Dkt. # 289, at 4-5. He asserts that he had a good faith belief that the bond programs would succeed and that the jury's verdict rejecting his good faith defense was against the weight of the evidence. Dkt. # 299, at 4. Fishman claims that the government failed to prove the following 17 issues beyond a reasonable doubt at trial:

1. The Government failed to prove that Mr. Fishman ever spoke to any [Caribou Capital] investor about buying fractional interests of shares of bonds.

2. The Government failed to prove that Mr. Fishman ever spoke to any investor about a specific amount that they were investing, planned to invest or had in fact invested with [Caribou Capital].

3. The Government failed to prove that Mr. Fishman was ever a party or signatory to any investor contracts or hold harmless agreement.

4. The Government failed to prove that any investor ever made a demand upon Mr. Fishman for the repayment of any investment.

5. The Government failed to prove that Mr. Fishman was ever an officer or director of Caribou Capital or a signatory on any bank account of Caribou Capital.

6. The Government failed to prove that Mr. Fishman had an agreement of any kind with Caribou Capital.

7. The Government failed to prove that Mr. Fishman had any agreement with Robert Searles or Lynn Thornburgh other than to render them assistance with placing bonds through Patrick Henriette or responding to Norah Cali's offer to purchase.

8. The Government failed to prove that Robert Searles or Lynn Thornburgh ever disclosed to Mr. Fishman that they were engaged in the fraudulent practice of syndication (selling shares or portions or fractional interests of bonds, rendering them securities).

9. The Government failed to prove that once [sic] Mr. Fishman continued to assist Mr. Searles or Mr. Thornburgh in any way once he discovered that they had been syndicating the railroad bonds. In fact, the evidence clearly shows that he reported them to Patrick Henriette and Norah Cali in order to withdraw from the conspiracy, if there was any evidence that one existed.

10. The Government failed to prove that Mr. Fishman ever engaged in an act which knowingly resulted in investors losing money. In fact, the evidence shows that Mr. Fishman tried to prevent at least one investor, Sonny Beckham, from losing $150,000.

11. The Government failed to prove that Mr. Fishman ever worked for Caribou Capital. The evidence shows that Mr. Fishman volunteered his time and labor to Patrick Henriette and Norah Cali without compensation.

12. The Government failed to prove that Mr. Fishman had anything to do with the activities of Robert Searles and Barbara Johnson in placing the Galveston Bonds of Barbara Johnson in other programs.

13. The Government failed to prove that despite the concerns and doubts expressed in his Grand Jury testimony, that Mr. Fishman ever abandoned his

        hope in Patrick Henriette and ever stopped renewing his paper work for his many sets or [sic] bonds with Mr. Henriette, or that he ever abandoned his belief that Mr. Henriette would succeed in placing the bonds in a favorable program until after he met with John Clancy in 2005 and realized that Mr. Clancy had deceived him by substituting the words "hypothecated value" with "hypothetical value." The evidence clearly shows from Patrick Henriette's testimony that Mr. Fishman maintained a relationship with him long after Mr. Henriette severed all ties with Mr. Searles and Mr. Thornburgh.

14. The Government failed to prove that Mr. Fishman ever abandoned his belief that Norah Cali would honor her offer to the Chinese Bond owners to purchase their Chinese Bonds for $845.00 apiece until he wrote a letter of disconnection to her on November 16th, 2005, when he discovered through specific due diligence that she was not genuine and that in fact she was a pathological liar.

15. The Government did not prove that any bond owner who bought bonds from Mr. Fishman ever lost money on the bonds. The Chinese bonds would have resulted in all bond owners doubling their money if they held the bonds until today. The Galveston owners would be able to sell their bonds for approximately what they paid for them through LaBarre Galleries.

16. The financial impact statement provided by the Government was false and misleading, and was characterized as "net income" rather that "gross income." Payments to Jack Fishman by Attorney James Jensen were included improperly.

17. The indictment indicated that the "co-conspirators purchased bonds" to promote the conspiracy. Mr. Fishman sold bonds to Thornburgh and Searles, but the Government failed to prove that Mr. Fishman ever knew that the investors' money was being used to purchase those bonds.

Dkt. # 289, at 2-4. However, defendant's motion does not cite to any testimony presented at trial supporting these assertions.[2] He claims that is not asking the Court to weigh the evidence or consider the credibility of any witness but, instead, is relying on the lack of evidence supporting the

---

[2] The Court is aware that a transcript of the trial is not available. However, defendant could have referred the Court to the testimony of a particular witness or exhibits to support his arguments.

12

points he has identified. The government responds that the issues identified by defendant do not go to the essential element of any offense and do not show the government failed to prove its case beyond a reasonable doubt.

Defendant's primary argument, as allegedly supported by issues one through eight, eleven, twelve, and seventeen, is that his "mere association" with Searles and Thornburgh is not enough to establish his membership in a conspiracy to commit mail or wire fraud or money laundering. Dkt. # 289, at 4. However, defendant overlooks evidence showing that he, Searles, and Thornburgh played different, but equally important, roles in the alleged conspiracy to establish and promote a fraudulent investment scheme. The government presented evidence showing that Fishman was an integral part of a conspiracy to defraud investors, and played a key role drafting documents and working with Henriette to further Caribou Capital's bond programs. Fishman argues that Thornburgh and Searles also worked for Zaccagnino and had knowledge of the same connections, such as Jensen and Clancy, and neither Thornburgh nor Searles needed Fishman's help to set up Caribou Capital. Dkt. # 299, at 3. However, Zaccagnino testified that Fishman participated in the bond programs even after Fishman knew the programs would not work and were fraudulent, and Fishman cooperated with authorities only after it became clear that the government was aware of the scheme. Zaccagnino also testified that Fishman produced the paperwork to maintain the bond programs and forged bond histories when the proper paperwork did not exist, and Thornburgh and Searles were simply salesman for his organization. Thus, it is not reasonable to infer that Thornburgh and Searles could have maintained a bond program without Fishman's assistance. The testimony presented at trial also shows that Fishman derived a substantial monetary benefit from investments placed with Caribou Capital, and he actively encouraged investors to keep their money

13

with Caribou Capital, even though he had determined the bond programs would not work. Fishman does not cite the evidentiary basis for his requested inference that Thornburgh and Searles operated their bond program without any assistance from Fishman but, in any event, the inference is not appropriate when considering the evidence in a light most favorable to the government. Considering that Fishman derived a monetary benefit from investments made with Caribou Capital and his integral role in preparing documentation for Caribou Capital, it was not unreasonable for the jury to conclude that Fishman was part of the same conspiracy to defraud investors as Thornburgh and Searles.

Fishman's motion could be read to separately argue that he was not a member of Caribou Capital and was not part of the conspiracy alleged in the second superseding indictment. Dkt. # 289, at 3; Dkt. # 299, at 2. However, the scope of the conspiracy was not defined by membership in Caribou Capital, and the government was not required to prove that Fishman was an owner or officer of Caribou Capital as an essential element of its case. The jury could have credited Chapa's testimony recounting Fishman's own statements about Fishman's involvement in the conspiracy. Even though Fishman was not a member of Caribou Capital, he clearly derived a monetary benefit from Caribou Capital's activities. Fishman also overlooks the substantial amount of documentary evidence showing that he played in active role in planning the conspiracy and ensuring that conspiracy continued. The government presented sufficient evidence from which the jury could have concluded that Fishman participated in a conspiracy with Thornburgh and Searles, and Fishman's assertion that he was not a member of Caribou Capital does not require the Court to set aside the jury's verdict.

Fishman argues that the government did not present any evidence contradicting his alleged good faith belief that the historical bonds could be used as a collateral to obtain loans from European banks. Dkt. # 299, at 4. Even assuming that Fishman personally believed that the bond programs would succeed, the jury could have determined that Fishman's belief in the bond programs was unreasonable, and the jury's verdict will not be set aside due to its rejection of the good faith defense. Although Fishman argued that the bonds could be placed with European banks through associates, such as Henriette, the evidence established that neither Fishman nor Henriette placed these bonds with a bank or that any bank even considered accepting the bonds as collateral. There was no evidence presented that any investor ever received a return on his or her investment, or even that such return was likely. As previously discussed, there was also ample evidence provided by Chapa and Zaccagnino that Fishman knew the bond programs were fraudulent, yet Fishman continued to work with Caribou Capital and accept money from investors. There was certainly a fact question as to whether Fishman possessed a good faith belief about the validity of the programs while the programs were being offered to investors. The jury also had an opportunity to view Henriette's deposition testimony and assess his credibility. The jury could have concluded that Fishman's reliance on Henriette was itself unreasonable and rejected Fishman's good faith defense on this basis alone, and Fishman is not entitled to a judgment of acquittal based on his good faith defense.

Fishman argues that the government failed to present any evidence that he took any actions in furtherance of the conspiracy after November 30, 2002, and the statute of limitations expired before the indictment was filed. Dkt. # 299, at 5-6. This argument was considered at the close of the government's case-in-chief and at the close of defendant's case, and the Court found substantial

15

evidence showing that the alleged conspiracy continued beyond November 30, 2002. As the Court explained on both occasions, it was not necessary for Fishman to commit an overt act in furtherance of the conspiracy after November 30, 2002, as long as the conspiracy continued past that date and he failed to withdraw, because the acts of his co-conspirators were attributable to him. Chapa's testimony established that he initiated contact with Fishman after November 30, 2002, and Fishman did not voluntarily approach any law enforcement agency in an attempt to disclose the conspiracy before that time. The Court also considered evidence that Fishman actively encouraged investors to maintain their investment with Caribou Capital as late as 2005. The Court instructed the jury that withdrawal from a conspiracy is effective only when a defendant has proven by a preponderance of the evidence that he took affirmative steps to defeat the purpose of the conspiracy or informed his co-conspirators that he was no longer a member of the conspiracy. Dkt. # 285, at 85. The evidence presented a fact issue sufficient for submission to the jury on this defense, and the jury could reasonably have concluded that Fishman did not withdraw from the conspiracy before November 30, 2002.

Lastly, Fishman argues that the evidence was insufficient to sustain a guilty verdict as to Count Two of the Second Superseding Indictment, because there was no evidence that he entered an agreement to engage in unlawful monetary transactions with criminally derived property. Dkt. # 289, at 5; Dkt. # 299, at 6. However, the government presented evidence that Fishman knew that Caribou Capital was receiving substantial funds from investors and that Caribou Capital was using those funds to purchase new bonds. There was also evidence that Fishman prepared documentation in connection with those newly purchased bonds. Assuming that Fishman was not a direct participant in any financial transaction, the government is correct that Fishman was charged with

conspiracy to conduct transactions with criminally derived property, and the issue is whether Fishman agreed to participate in a conspiracy to commit the unlawful activity alleged in Count Two. The Court instructed the jury on the elements of conspiracy and provided the following instruction on the elements of conducting financial transactions with unlawfully derived property:

> FIRST: THE DEFENDANT KNOWINGLY CONDUCTED A FINANCIAL TRANSACTION AS DEFINED HEREIN;
>
> SECOND: THE DEFENDANT KNEW THE PROPERTY INVOLVED IN THE FINANCIAL TRANSACTION REPRESENTED THE PROCEEDS OF SOME FORM OF UNLAWFUL ACTIVITY;
>
> THIRD: THE FINANCIAL TRANSACTION INVOLVED THE PROCEEDS OF SPECIFIED UNLAWFUL ACTIVITY; AND
>
> FOURTH: THE DEFENDANT CONDUCTED THE FINANCIAL TRANSACTION WITH THE INTENT TO PROMOTE THE CARRYING ON OF SPECIFIED UNLAWFUL ACTIVITY.

Dkt. # 285, at 75. Chapa's testimony provided support for the government's argument that Fishman knew the bond programs would not work and were fraudulent and, thus, any monetary transactions involving investor funds in fraudulent investment schemes were unlawful. The government also presented sufficient evidence that Fishman knew how investor funds were being spent, and actively worked to further any illegal activity using the investors' funds. Fishman has not identified a factual basis for his argument that he did not participate in a conspiracy to conduct monetary transactions with criminally derived property and, viewing the evidence in a light most favorable to the government, there is no basis to set aside the jury's verdict as to Count Two.

**IT IS THEREFORE ORDERED** that the Motion for Judgment of Acquittal of Defendant Fishman Pursuant to F.R.C.P. 29(c) (Dkt. # 289) is **denied**.

**DATED** this 21st day of September, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

17