## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 07-CR-0195-004-CVE** |
| | ) | **(12-CV-0607-CVE-TLW)** |
| STEVEN FISHMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On October 29, 2012, defendant Steven Fishman, a federal prisoner appearing pro se, filed an amended motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Dkt. # 491).[1] Section 2255 provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence."[2]

---

[1]     Defendant filed a post-judgment motion to dismiss the indictment (Dkt. # 477) and the Court advised defendant that it would treat the motion as a § 2255 motion. Defendant was given the opportunity to withdraw or supplement his motion. Defendant chose to file an amended § 2255 motion asserting additional claims, and he withdrew his motion to dismiss.

[2]     Defendant has also filed a motion to supplement the pleadings to include reference to United States v. Xu, 706 F.3d 965 (9th Cir. 2013). Dkt. # 503. The Court has reviewed Xu and it has no applicability to this case, because Xu concerns the extraterritorial reach of the Racketeer Influenced and Corrupt Organizations Act (RICO). Defendant was not charged with a violation of RICO and Xu does not relate to any issue in this case, and his motion to supplement (Dkt. # 503) should be denied.

# I.

On November 30, 2007, a grand jury returned a sealed indictment charging Fishman, Robert Searles, Joseph Thornburgh, and Wayne Davidson[3] with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 (count one) and conspiracy to launder money in violation of 18 U.S.C. § 1956(h) (count two). On September 11, 2008, Fishman made his initial appearance pursuant to a summons and Stanley Monroe was appointed to represent him. Dkt. # 30. Fishman was released on a bond and other conditions of pretrial release.[4] The government filed a motion (Dkt. # 27) to declare this matter a complex case under the Speedy Trial Act, 18 U.S.C. § 3161 et seq., and the motion was granted. Dkt. # 52. The trial was continued from October 2008 to February 2009. Defendants filed a motion (Dkt. # 98) to continue all deadlines due to the volume of discovery produced by the government, and the Court reset the trial for May 2009. Dkt. # 101.

Fishman filed numerous motions to dismiss the indictment and for pretrial discovery.[5] The defendants collectively argued that the statute of limitations expired before the case was filed and that the case should be dismissed due to the government's unreasonable delay in prosecuting the criminal charges against defendants. Dkt. ## 84, 89, 96. Fishman argued that he had cooperated with government agents and federal prosecutors in Illinois, and the government was impermissibly

---

[3]    Davidson has never made an initial appearance before this Court and he remains a fugitive.

[4]    One of the conditions of defendant's pretrial release was that the defendant refrain from working directly or indirectly in any business or profession concerning "the offer, sale, purchase, trade, brokering, solicitation, or similar transaction of any real property, security or negotiable instrument, or the acquisition of any loan or appropriation or liquidation of any asset for another person or business." Dkt. # 33, at 3.

[5]    Defendants filed many pretrial motions but not all of these motions are relevant to Fishman's § 2255 motion. The Court will reference only those motions that have some bearing on the arguments raised in Fishman's § 2255 motion.

attempting to use against him evidence obtained as a result of his cooperation. Dkt. # 94. The Court denied without a hearing all but one of the motions to dismiss, and the Court set a hearing on Fishman's motion concerning the government's use of allegedly immunized statements. Dkt. # 138, at 16. On March 2, 2009, the Court held an evidentiary hearing and heard testimony from Fishman and other witnesses concerning his alleged cooperation. The Court found that Fishman was not granted use immunity when he testified before the grand jury and he had no objective basis to believe that he had an implied or express agreement with the United States Attorney's office that he would not be prosecuted if he cooperated with the investigation. Dkt. # 162. Fishman had only a subjective belief that he would not be prosecuted, and his statements and grand jury testimony were not made pursuant to any type of immunity agreement. Id. at 11.

On April 10, 2009, a grand jury returned a superseding indictment (Dkt. # 196) clarifying certain factual allegations, but no new criminal charges were alleged. Searles had changed his plea to guilty as to count one on April 3, 2009, and he was not named as a defendant in the superseding indictment. See Dkt. ## 186, 196. At the request of the government, the Court continued the jury trial to June 15, 2009. Dkt. # 225. The government filed notice (Dkt. # 245) that it intended to offer evidence that could constitute evidence of other bad acts under Fed. R. Evid. 404(b), and Fishman's attorney Monroe filed an objection (Dkt. # 246) to the government's notice. At the pretrial conference, the Court advised the parties it would hold a hearing on the admissibility of Rule 404(b) evidence on the afternoon of the first day of trial. On June 14, 2009, Fishman filed a motion in limine (Dkt. # 257) to exclude evidence of his affiliation with the Church of Scientology and to redact evidence of his prior criminal convictions from the indictment. Before jury selection began, the Court granted Fishman's motion in its entirety. Dkt. # 371, at 10-12.

On June 15, 2009, the Court selected a jury and held an evidentiary hearing concerning redaction of the indictment and the admissibility of Rule 404(b) evidence. Thornburgh argued that reference to his prior convictions should be redacted from the copies of the indictment read and given to the jury, and the Court found that the indictment should be redacted. Id. at 22-28. Fishman and Thornburgh both sought to exclude evidence of their prior convictions under Rule 404(b). The government requested additional time to conduct research to show that the convictions could be admissible, but the Court determined that any mention of the convictions should be redacted from the copies of the indictment provided to the jury. Id. at 27. The Court deferred a decision on the admissibility of the convictions, but the parties were advised to approach the bench if it appeared that the government would seek to use this evidence. The government asserted that it had evidence other than defendants' prior convictions that would be admissible under Rule 404(b). The Court found that the government could introduce evidence that Fishman had attended one year of law school and that he formerly held securities licenses issued by the Securities and Exchange Commission (SEC). Id. at 40-41. The government was also permitted to elicit testimony concerning Fishman's involvement with Peter Zaccagnino in a similar fraudulent scheme involving historical railroad bonds. Id. at 46-47. The Court preliminarily found that evidence concerning Fishman's involvement with the Atlas Monetary International Trust, a fraudulent investment scheme using historical bonds, should be excluded because the conduct occurred after the alleged conspiracies in this case ended.[6] Id. at 61.

---

[6] The conditions of Fishman's pretrial release were modified, in part, because of his involvement in another scheme involving historical bonds. See Dkt. # 232.

The parties made opening statements on the morning of June 16, 2009 and, following opening statements, the government called United States Postal Inspector Albert Chapa as its first witness. Dkt. # 372, at 16. Chapa testified about the history of the government's investigation into Fishman's activities. He learned about Caribou Capital Corporation (Caribou Capitol) and the bond trading programs from an investor, Marsha Longaberger, who alleged that she had been defrauded and had lost a substantial amount of money. Id. at 18. Based on the information provided by Longaberger, Chapa obtained a search warrant for an apartment in Tulsa, Oklahoma and almost 5,900 pages of documents were recovered. Id. at 21. Many of the documents mentioned a bond program operated by Caribou Capital. Id. at 23-24. Chapa also found documents describing an investigation by the SEC into an investment scheme managed by Peter Zaccagnino, and Fishman's name was mentioned on many of the SEC documents. Id. at 27-28. Zaccagnino solicited investors by falsely representing that he could use historical railroad bonds to obtain a substantial return on their investment. Id. at 26-28. Caribou Capital operated a similar bond program and investors were told that Caribou Capital had "valuable knowledge of private placement programs dealing with historical gold-backed railroad bonds . . . ." Id. at 31. The documents recovered by Chapa showed that investors paid substantial sums to Caribou Capital, but there was no evidence that any investor was ever paid by Caribou Capital. See id. at 49. Thornburgh also represented to investors that Caribou Capital was in possession of bonds issued by the People's Republic of China in the early 1900s, and Caribou Capital solicited investments based on these bonds. Id. at 52-54. On behalf of Caribou Capital, Fishman contacted Patrick Henriette about a proposal to place bonds with an investor. Id. at 72-73. Fishman also dealt with a company called Safekeeping Depository of America for the purpose of safeguarding bonds used in furtherance of the alleged investments of

Caribou Capital, because investors would request documentation to verify that bonds were properly secured. Id. at 90-91. Caribou Capital obtained "hypothecated values" of the historical bonds from John Clancy, and Clancy provided reports estimating that the historical bonds were valued at millions, or even billions, of dollars. Id. at 101-06. Fishman communicated with Clancy to obtain the hypothecated values of the bonds. Id. at 107. E-mails recovered by Chapa showed that Fishman was integral in communicating with Henriette, and Chapa testified that Fishman was solely responsible for directing Searles and Thornburgh as to generating and processing the documentation to further the alleged investments in historical bonds. Id. at 113. Fishman also communicated with investors to assure them that the bond investment program was working, even though investors became concerned about delays in received the promised returns on their investments. Id. at 118-19.

The government called Dennis Moore, deputy general counsel and solicitor general of Amtrak, to testify out of turn, and he testified that Amtrak was formed in the 1970s to take over passenger rail service for struggling railroads. Id. at 125. Amtrak did not assume the debts of those railroad companies. Id. Amtrak does not own any assets that belonged to the former Galveston, Houston & Henderson Railroad. Id. at 129, 137. Any bonds issued by the Galveston, Houston & Henderson Railroad would have been a liability that would have been considered part of the railroad's bankruptcy estate. Id. at 137. On cross-examination, Moore testified that he had reviewed Amtrak's files and records, and he found no evidence that Amtrak had any knowledge of bonds issued by the Galveston, Houston & Henderson Railroad or that it agreed to assume any liability for the bonds. Id. at 143.

Chapa resumed his testimony and explained that Walter Buzz Hibbard of Safekeeping Depository of America responded to a subpoena for documents belonging to Thornburgh and Searles. Id. at 149. The documents provided by Hibbard included historical bonds and letters suggesting that Searles, Thornburgh, or Fishman were attempting to place bonds in investment programs. Id. at 149-51. Chapa reviewed e-mails sent by Fishman concerning Caribou Capital's attempts to generate revenue from historical bonds, including alleged meetings with foreign banks and investors. Id. at 154-60. The documents showed that the alleged meetings with foreign banks and investors did not result in the placement of any bonds in an investment program. Id. at 160. Fishman continued to obtain historical bonds for Caribou Capital. Id. at 165, 174-75. The evidence also showed that Thornburgh and Fishman were receiving payments from Caribou Capital, even though investors were not being paid. Id. at 175. Thornburgh traveled to Europe and incurred substantial expenses at hotels and restaurants, and many of these expenses were paid directly by investors of Caribou Capital who believed that Thornburgh was seeking to place bonds in an investment program. Fishman contacted investors to solicit funds to pay these expenses. Id. at 185.

Chapa's testimony continued on the third day of trial and he discussed documents detailing Clancy's relationship with Caribou Capital. Dkt. # 373, at 4. Clancy agreed to examine historical bonds sent to him by Caribou Capital, but Clancy would not have any contact with the actual owners of the bonds. Id. at 5. Caribou Capital agreed to pay for Clancy to generate reports as to the hypothecated value of the bonds. Id. Documents produced by Searles showed that Fishman had previously worked with Zaccagnino on a "historical bond high-yield program" and that Fishman was working with Caribou Capital on a similar investment program. Id. at 7-9. In fact, Caribou Capital relied on Fishman's expertise in bond trading programs to solicit investors. Id. at 11. By May 2004,

Fishman came to believe that law enforcement officials were monitoring Thornburgh's activities and phone calls, and he advised Henriette to avoid talking to Thornburgh on the phone. Id. at 21. Chapa contacted Fishman and asked him to provide documents, and Fishman complied with Chapa's request. Id. at 22-23. The documents contained a 1998 letter to Clancy from the Bureau of Public Debt explaining that certain historical railroad bonds had no value, and there was a note attached in Fishman's handwriting showing that he had read the letter. Id. at 26-27. In an e-mail that Fishman preserved, he acknowledged that historical railroad bonds "have no value beyond that of collectibles." Id. at 31, 53. In 2003, Fishman told Chapa that he did all of Henriette's paperwork but Henriette had never been successful in placing a bond in an investment program. Id. at 52. Fishman later modified his opinion on the value of the bonds, and he claimed that Henriette was just unsuccessful in finding a suitable investment. Id. at 53. Fishman mentioned a woman named Norah Cali, allegedly the niece of Alan Greenspan, and Cali had told Fishman that historical Chinese bonds were worthless. Id. at 54.

On cross-examination, Chapa testified that Longaberger made the initial complaint about an alleged investment scheme and that he subsequently contacted other investors after Longaberger's complaint. Id. at 62. Chapa learned from Fishman that he was cooperating with the United States Attorney in Peoria, Illinois in connection with an investigation into Zaccagnino's activities. Id. at 65-67. Fishman told Chapa that he inherited historical bonds from his father, Jack Fishman, but Fishman did not believe that the bonds had value other than as a collectible. Id. at 72-73. Fishman's attorney attempted to show that Fishman did not realize until a 2005 conversations with Clancy that the bonds had no value, but Chapa testified that Fishman was aware of this fact well before 2005. Id. at 78.

Chapa's cross-examination was interrupted for the testimony of Matthew Johnson, a commissioned bank examiner for the Office of the Comptroller of the Currency (the Office). Id. at 81. The Office is responsible for chartering, supervising, and examining national banks, and the Office responds to inquiries about bonds and the obligations of defunct corporations. Id. at 82. The Office received inquiries about bonds issued by the Galveston, Houston & Henderson Railroad, and the Office responded that the bonds had no value outside of their historical significance. Id. at 84. The railroad bonds were not guaranteed by the United States government or the State of Texas. Id. at 86-87.

Fishman's attorney resumed his cross-examination of Chapa. Id. at 98. Chapa interviewed Fishman on October 27, 2003, and Fishman stated that he believed that historical railroad bonds that he had inherited from his father had monetary value. Id. at 106. Chapa believed that Fishman began working for Zaccagnino in late 1997, and it was through Zaccagnino that Fishman initially met Searles and Thornburgh. Id. at 114-15. Fishman communicated with Cali about using Chinese bonds in an investment program, and Fishman claimed that Cali was the niece of Alan Greenspan. Id. at 131. Fishman eventually decided to distance himself from Cali, and defense counsel attempted to imply that Cali was "mentally unstable." Id. at 132. Defense counsel also attempted to elicit testimony from Chapa that Fishman instructed concerned investors to contact Chapa, but Chapa denied that any investor contacted him at Fishman's request. Id. at 134. On redirect, Chapa testified that Fishman made no attempt to contact any law enforcement authorities before 2003. Id. at 142.

George LaBarre, a dealer in historical collectibles, was the next witness called by the government. Id. at 147. LaBarre's business focused on "collectible stocks and bonds, stamps, paper money, coins, and other historical Americana." Id. Fishman, allegedly on behalf of David

Bensimon, purchased Chinese bonds from LaBarre for about $120 or $130 each and LaBarre advised Fishman, as he did all of his purchasers, that the bonds were strictly collectibles. Id. at 148-49. LaBarre testified that Galveston railroad bonds were in high demand from about 1995 to 2000. Id. at 153.

Clayton Wible, special agent for the Federal Bureau of Investigation (FBI), testified that he interviewed Fishman about his association with or knowledge of historical railroad bonds, but Fishman was not the target of Wible's investigation. Id. at 164. Fishman claimed that David Watson introduced him to Zaccagnino. Zaccagnino was operating a business called Two-Thirds International. Fishman denied that he was a member or employee of Two-Thirds International, but he admitted that he prepared paperwork for clients of the business. Id. at 166. Zaccagnino and Fishman began selling historical bonds to Michael Huxley, and Huxley paid Zaccagnino and Fishman approximately $1 million for the bonds. Id. at 167-68. Fishman obtained "hypothecated" values for the bonds from Gerald Dobbins, but Fishman described the hypothecated values as "ridiculous." Id. at 169-170. On cross-examination, defense counsel asked about Fishman's alleged European contacts, and Fishman had told Wible about a person identified as Jose Buisan. Fishman believed that Buisan could use historical bonds in investment programs in Europe, but Buisan could not place the bonds in an investment program. Id. at 173.

The next witness called by the government was Zaccagnino, who was incarcerated in federal prison at the time. Id. at 179. Zaccagnino acknowledged that he had been convicted of federal criminal charges of money laundering, mail fraud, bank fraud, racketeering, and related conspiracy charges. Id. at 180. The charges against Zaccagnino involved a fraudulent investment scheme based on historical railroad bonds. Id. In 1997, Zaccagnino purchased historical railroad bonds from

Dobbins, and he paid about $10,000 per bond. Id. at 183. Zaccagnino had received advice from Howard Field and Field's friend Joe that the bonds could be placed in an investment program in Europe. This advice was based on the "hypothecated" value of the historical bonds. Zaccagnino believed that the historical bonds could be used in a high yield investment program, but he was not making any money for himself or his investors. Id. at 187. Zaccagnino was going to abandon his investment company called Two-Thirds International, but an investor "loaned" Zaccagnino $5,000 so that he could remain with the program. Id. Zaccagnino was introduced to Fishman as a person who owned some historical railroad bonds, and he eventually went into business with Fishman. Id. at 189. Fishman contacted Zaccagnino about a potential investor who wanted to buy over $1 million in historical bonds, and Zaccagnino invited Fishman to become a partner in Two-Thirds International. Investors began to send Two-Thirds International wire transfers of up to $400,000, and Fishman and Zaccagnino bought cars, houses, and more historical bonds with the money. Id. at 191-92. Two-Thirds International began to do business with Thornburgh, Searles, and Caribou Capital, and their arrangement was highly profitable to Zaccagnino, Fishman, Searles, and Thornburgh. Id. at 196-97. Two-Thirds International continued to make money for Zaccagnino and Fishman, but Fishman learned that their European contact, Buisan, had lied to them and he had never placed a bond in an investment program in Europe. Id. at 202-03. Fishman assumed additional responsibilities for Two-Thirds International, and he began drafting paperwork and dealing with clients directly. Id. at 204-05. Fishman was introduced to Henriette and Henriette claimed that he could place bonds with European banks, but Zaccagnino was becoming skeptical that the bond investment program would ever be successful. Id. at 206. Fishman approached Zaccagnino and stated that he had spent all of his money, and Fishman claimed in late 1998 or early 1999 that he

realized that the historical railroad bonds were a "dead end." <u>Id.</u> at 207. However, Fishman continued to work with Zaccagnino and he was integral in developing false "lineages" for historical bonds held by Two-Thirds International. <u>Id.</u> at 210. Fishman also came up with the idea of having a person identified as Ronald Blesso portray a bond authenticator, but the idea was abandoned when Blesso refused to participate in the fraudulent scheme. <u>Id.</u> at 212-13. In 2001 or 2002, Fishman informed Zaccagnino about a federal investigation based in Peoria, Illinois, and Fishman stated that he would cut off all communication with Zaccagnino. <u>Id.</u> at 214-15.

The government called Hibbard, a dealer in historical bonds, to testify about his dealings with Two-Thirds International. Hibbard initially met with Zaccagnino at the offices of Two-Thirds International, and Zaccagnino represented to Hibbard that Fishman played an important role in the business. Dkt. # 374, at 59. In 2000, Fishman contacted Hibbard to see if Hibbard would be willing to open a depository for historical bonds. <u>Id.</u> at 63. Other depositories had been raided by the SEC or had shut down, and Fishman did not have anywhere to store his historical bonds. <u>Id.</u> at 65. Fishman explained that Henriette had specific requirements for the safekeeping of historical bonds. <u>Id.</u> at 68-69. Hibbard opened a depository in 2001. <u>Id.</u> at 70. Sometime in 2001, Fishman invited Hibbard and bond owners to his home in California to meet Henriette. <u>Id.</u> at 71. Hibbard met with Henriette at a hotel in California, and Henriette acknowledged that he had never successfully placed a bond in an investment program. <u>Id.</u> at 72. However, Henriette encouraged Hibbard to invest with Fishman. <u>Id.</u> at 72-73. Fishman prepared all of the documents for investors. <u>Id.</u> at 74. Fishman also represented that he believed the investment programs would be successful, and Hibbard agreed to invest with Fishman and Henriette. <u>Id.</u> at 75-76. Hibbard never saw a return on his investment, and Fishman and Henriette offered numerous excuses for the failure of the investment program. <u>Id.</u>

at 77. The bond investment programs were originally based on historical railroad bonds, but Fishman and Henriette later switched to historical Chinese bonds. Id. at 79. Fishman claimed that Cali, allegedly a relation of Alan Greenspan, could place the Chinese bonds in high yield investment programs. Id. at 80. Hibbard shut down his depository in 2005. Id. at 86. Hibbard contacted Fishman in 2007, and Fishman admitted that he had lied about Cali's and Henriette's background. Id. at 87-88. Hibbard paid Fishman a secretarial fee for preparing safekeeping receipts for bonds placed in Hibbard's depository. Id. at 145. Fishman also received a commission from the sale of historical railroad bonds, even if he did not directly participate in the sale. Id. at 146. Hibbard testified that Fishman would report to investors about Henriette's activities, but Hibbard denied that Fishman had any "useful" contacts in Europe. Id. In conversations with Hibbard, Fishman questioned Clancy's hypothecated values for historical bonds and Fishman stated that Clancy claimed to have made "$13 million on idiots like [Hibbard]." Id. at 158.

The government called David Gildar to testify about Caribou Capital's efforts to solicit an investment from him, and Gildar testified that Thornburgh and Searles actively encouraged him to invest in historical bonds. Gildar later became acquainted with Fishman and he went to Fishman's residence in 2000 or 2001 to meet with Fishman, Henriette, and other investors. Id. at 188. Fishman sent letters to Gildar asking him to complete and notarize forms for Henriette's use in placing bonds into trading programs in Europe. Id. at 188. Fishman was particularly interested in establishing a history of ownership for historical bonds. Id. at 190. Gildar had dealings with Thornburgh, Searles, Fishman, and Zaccagnino, but he became aware that there was a falling out with Zaccagnino and Fishman became Gildar's main contact with Caribou Capital. Id. at 190-93. Fishman led Gildar to believe that Caribou Capital was operating a legitimate investment program, and Fishman held out

that Clancy's hypothecated bond values were accurate. Id. at 196-97. Fishman never expressed any doubt that Henriette was a legitimate businessman who would successfully place historical bonds into an investment program. Id. at 198. On cross-examination, Gildar admitted that he did not purchase a historical bond from Fishman. Id. at 205.

Another investor, Robert Bradley, testified that he spoke to Fishman about the possibility of buying a historical railroad bond, and Fishman encouraged Bradley to purchase a bond and have the bond authenticated. Id. at 222-23. Zaccagnino was also present at the meeting, and Zaccagnino told Bradley that he could get his money back if the bond did not make a return for Bradley within seven days. Id. at 223-24. Bradley purchased a bond from Fishman and Zaccagnino, and he received updates about his investment from Fishman. Id. at 225. Zaccagnino was not involved with the investment program after some time, and Fishman became Bradley's sole contact. Id. at 227. Fishman represented to Bradley that Henriette would place the bonds into a European trading program, and Bradley relied on Fishman's claim that Henriette was a legitimate businessman. Id. at 228-29. Bradley did not receive any return on his investment and he did not receive his initial investment back from Fishman. Id. at 229.

Monroe advised the Court that he had been attempting to serve a subpoena on Clancy to compel him to testify, but Monroe learned that Clancy was represented by counsel and Clancy's counsel advised Clancy to invoke his Fifth Amendment right against self-incrimination if he were called as a witness. Dkt. # 375, at 7. Monroe also stated that the government had served a subpoena on Cali, but Cali was being "evasive" and Cali would not admit that she had received the subpoena. Id. at 9-10. However, the government had decided that it would not call Cali as a witness due to

concerns about her "mental capacity," and the Court advised Monroe that he would have to serve a subpoena on Cali to compel her testify at trial. Id. at 15-16.

Wayne Maltz testified that a friend introduced him to Thornburgh to discuss an investment opportunity, and Thornburg contacted Maltz to describe the "high leverage placement program" involving historical railroad bonds. Id. at 84-86. Thornburgh represented that the bonds had been deemed legitimate by the Florida Supreme Court, but the Florida Supreme Court sealed its decision due to large amounts of money that could be earned by investors. Id. at 86. Thornburgh told Maltz that he needed at least $50,000 to invest in the bonds, and Maltz decided to take money out of his retirement account in order to invest. Id. at 87. Maltz never met Fishman, but he did receive documents from Fishman and speak to Fishman on the phone. Id. at 101. Fishman assured Maltz that the investment program would be successful, even though were delays in getting a return on the investment. Id. at 102. Fishman provided similar updates to Maltz from December 2001 to the summer of 2002. Id. at 105. Maltz was also sending additional funds to Thornburgh to allegedly keep the investment program going. Id. at 103-11. Thornburgh asked Maltz to send money to Fishman as well, and Maltz sent money to Fishman on at least two occasions. Id. at 118, 128. Maltz sent a total of $108,000 to Thornburgh and Fishman, but he was never paid back and his investment of $205,000 was never returned to him. Id. at 130-32. Tessa Maltz, Wayne Maltz's daughter, testified that she also invested money with Thornburgh and Fishman, but she was initially apprehensive about the investment. Id. at 159-61. Tessa Maltz spoke to Fishman about historical bonds, and Fishman mentioned a connection between Alan Greenspan and Cali. Id. at 161. Tessa Maltz thought that this meant the investment program was credible, and she was also told that a certain amount of the proceeds from the investment would be given to charity. Id. She described

Fishman as "a key player in the Chinese bond deal . . ." Id. at 165. David Franco, a certified public accountant, testified about one of his client's involvement with the historical bond program solicited by Thornburgh. Id. at 213. Franco's client, John Estes, wanted advice from Franco about whether to invest in the historical bond program, and Franco spoke to Thornburgh and Fishman. Id. at 213-14. Franco asked technical questions about how the investment worked, and Fishman explained that historical bonds had been evaluated by independent third parties as extremely valuable. Id. at 216. Fishman told Franco that the bonds could be used to obtain loans and the loans would be placed in trading programs in Europe. Id. at 217. Franco believed that Fishman was running the bond trading program and that Thornburgh was a "helper." Id. at 218. Estes decided to invest $57,000 with Fishman and Thornburgh. Id. at 225. Estes did not receive any return on his investment, and Fishman and Thornburgh provided evasive answers about why the investment program was unsuccessful. Id. at 226. In 2003 or 2004, Fishman called Franco to ask if Estes wanted to invest more money in historical bonds. Id. at 227.

Another investor, Jeff Hayslett, spoke to Thornburgh about investing in historical bonds, and Hayslett initially chose to invest $50,000. Dkt. # 376, at 1-8. Hayslett subsequently invested another $50,000. Id. at 9. Hayslett signed an agreement stating that he would be paid $250,000 per month for ten months once the investment program turned a profit, but he could request the return of his investment if the program was unsuccessful. Id. at 10. In 2002 and 2003, Hayslett spoke to Fishman about the investment, and Hayslett believed that Fishman spoke to him to lend "credibility" to the investment program. Id. at 14. Thornburgh and Fishman later encouraged Hayslett to invest additional money in a Chinese bond program, and Hayslett did invest another $15,000. Id. at 22. Hayslett did not receive any of his money back from Fishman and Thornburgh. Id. at 24. Hayslett

16

eventually told Fishman that he thought the investment program was a scam and he asked for his money back, and Fishman claimed that he never represented that the bonds were anything other than collectibles. Id. at 32. Tracy Grist of Darwin, Australia testified about her investment in an investment program solicited by Wayne Davidson and Searles. Id. at 33-39. Grist was told that she would receive a return on her investment and that some of the profits would be used for humanitarian purposes. Id. at 39. Documents provided to Grist identified Caribou Capital as the program coordinator, and Caribou Capital held out that it had a relationship with Fishman. Id. at 44. Grist dealt primarily with Searles and Davidson, and she was repeatedly given excuses as to why she had not received her money back or a return on her investment. Id. at 50-71.

Barbara Johnson, Searles' former girlfriend, testified about her knowledge of and involvement with historical bonds. Fishman talked to Johnson four or five times to encourage her to invest in a bond trading program. Id. at 77-78. Fishman told Johnson about Henriette, and he claimed that Henriette could use the bonds to obtain a line of credit from European banks. Id. at 79. In April 2004, Johnson purchased a historical railroad bond for $13,000 and she wired the money to Fishman. Id. at 83. She testified that Fishman acted with a sense of urgency and he made it appear as if it were important for the transaction to occur quickly. Id. at 88. In October 2004, Johnson purchased two additional bonds for $20,000, but Fishman intended to place the bonds with Sir James Carrigan. Id. at 90-91. Carrigan was allegedly a British lord who operated a charitable foundation, and Fishman claimed that Carrigan had ties to Barclays Bank. Id. at 92. Fishman continued to solicit Johnson to purchase additional bonds, and she did send Fishman more money. Johnson started to distrust Fishman and she began taking notes of her phone conversations with Fishman. Id. at 96. Fishman claimed that he and Henriette were actively attempting to place the

bonds in trading programs, but she ceased to believe Fishman and she formed an opinion that the bond trading program was a scam.  Id. at 105.  Johnson lost a total of $105,000 and she admits that she was angry at Fishman and Searles.  Id. at 158-59.

Searles, Fishman's co-defendant, testified as part of the government's case-in-chief.  Searles admitted that he had pled guilty to one count of mail fraud and that he had a cooperation agreement with the government.  Id. at 1236.  He stated that the conspirators had lied to investors that their funds would be returned to them if the bond trading program was unsuccessful, because the money had already been spent.  Id. at 1237.  Searles described how he formed Caribou Capital in 1991 and how initial attempts to set up an investment program with historical railroad bonds were unsuccessful, and it was not until he became acquainted with Zaccagnino and Fishman that he was able to solicit clients to invest in historical railroad bonds.  Id. at 1239-44.  Searles believed that Fishman was responsible for preparing paperwork and that he assisted Zaccagnino.  Id. at 1245.  Thornburgh and Zaccagnino were responsible for recruiting investors and they were permitted to keep a fee on each bond sold.  Id. at 1246.  In 1998, Zaccagnino ceased his involvement in historical bond trading, and Fishman entered an agreement with Thornburgh and Searles to sell historical bonds using Fishman's connection with Henriette.  Id. at 39.  Investors became upset when they were not receiving payments promised under their contracts, and Fishman would prepare periodic updates to calm investors.  Id. at 49.  Searles rarely talked to Henriette himself and he relied on Fishman for updates about Henriette's activities to place the bonds in a trading program in Europe. Id. at 49-50.  Searles believed he could rely on Fishman because Fishman refused to accept payment for his services, but Searles did not know that Fishman was receiving a commission for arranging the sales of historical bonds.  Id. at 54.  When investors demanded their money back and the

historical railroad bond programs were unsuccessful, Fishman proposed a new bond trading program involving Chinese bonds. Id. at 58. The new program did not generate any money for investors, and Searles became fearful that he would face civil and criminal liability. Id. at 64. Searles testified that Caribou Capital had received about $3 million from investors but only about $400,000 was ever paid back to investors. Id. at 89.

Kathy Beckner, a special agent for the Internal Revenue Service (IRS), testified that Caribou Capital had a bank account and that it accepted deposits of over $4 million from investors in New Zealand, Australia, and the United States. Id. at 226-27. She also examined Fishman's own bank account and he had received $238,508 of investor funds. Id. at 229. Thornburgh's bank account contained approximately $442,000 of investor funds, and Searles spent over $1.3 million of investor funds that had been deposited in Caribou Capital's account. Id. at 231. Caribou Capital paid Fishman over $36,000 from June 2001 to December 2004. Id. at 236.

The government rested after excerpts from Fishman's grand jury testimony were read to the jury. Dkt. # 378, at 4. Fishman and Thornburgh had filed written motions for judgment of acquittal (Dkt. ## 275, 276), and the Court permitted defense to make any additional oral argument in support of their motions. Dkt. # 378, at 6. The Court denied defendant's motions. Id. at 8-20.

Fishman called Chapa as a witness on his behalf. Chapa recalled that he had met with Fishman on the day that Fishman testified before the grand jury. Id. at 22. Chapa denied that an assistant United States Attorney had yelled at or threatened Fishman, and he observed that Fishman became more nervous as he learned the extent of Chapa's knowledge of Fishman's activities. Id. at 25-26. Chapa testified that Cali had been served with a subpoena to testify at trial, but Cali refused to comply with the subpoena and she would not agree to testify at trial. Id. at 27. Fishman's

attorney, Monroe, offered certain e-mails between Fishman and Cali as exhibits, and the e-mails concerned the sale of Chinese bonds.  Id. at 30-37.  Some of the e-mails seemed to show that Fishman expressed doubt about Cali's representations concerning the value of the Chinese bonds.  Id. at 39, 43.  Fishman continued to request updates from Cali about her efforts to set up a trading program using the Chinese bonds, and Cali began to get irritated with Fishman's requests for information.  Id. at 62-63.  In November 2005, Fishman sent Cali an e-mail stating that he would no longer communicate with her and accused Cali of lying about a "multiplicity of subjects."  Id. at 64.  However, Cali had prepared a report in January 2005 stating that "anyone who thinks these bonds have a value is stupid."  Id. at 70.  Fishman also sent an e-mail to Cali referencing Henriette, and Fishman acknowledged that "greed and stupidity" prompted him to trust Henriette.  Id. at 71-72.  Fishman did not pass on to investors his doubts about either the historical railroad bonds or the Chinese bonds.  Id. at 74.  Following Chapa's testimony, Fishman presented the testimony of Henriette by video deposition.  Id. at 78-79.

Fishman also called Mike Bandy, a former special agent for the IRS, to testify about Fishman's role as an informant against Zaccagnino.  Id. at 21-23.  Bandy testified that Fishman claimed to have lost about $100,000 while investing with Zaccagnino, but Bandy was not clear if that information could be corroborated by a source other than Fishman.  Id. at 26-27, 72.  Bandy interviewed Zaccagnino during his investigation and noted that Zaccagnino resented Fishman for cooperating with law enforcement authorities.  Id. at 28.  Bandy learned that Fishman was paid by Zaccagnino, but Zaccagnino kept most of the money gained from the sale of historical railroad bonds and accompanying high yield investment programs.  Id. at 30.  Bandy became aware that Fishman was the target of an investigation by federal prosecutors and he was surprised when Fishman was

indicted.  Id. at 37-38.  Bandy testified that he told Fishman no later than February 2002 that historical railroad bonds were worthless and that the logic of a high yield investment scheme based on the bonds was "nonsense."  Id. at 47.  The government offered exhibits showing that Fishman continued to represent to others after February 2002 that historical railroad bonds were a legitimate investment.  Id. at 48-50.  Fishman did not tell Bandy that he was receiving a fee to prepare documents for investors, and Bandy testified that this type of alternate revenue stream is typical of fraudulent schemes.  Id. at 53.  Fishman also did not disclose to Bandy that he was working closely with Caribou Capital or that he was directly receiving funds from Caribou Capital's investors.  Id. at 59-60.  Fishman also called Kathy Beckner as a witness, but Fishman did not take the stand. Fishman renewed his motion for a judgment of acquittal, but the motion was denied.  Dkt. # 286, at 3.

The Court instructed the jury as to both conspiracy counts charged in the second superseding indictment and Fishman's defenses to the charges.  The Court instructed the jury on Fishman's defense that evidence of a separate conspiracy was not sufficient to prove his guilt unless he was also a member of a conspiracy to commit the alleged charges.  Dkt. # 285, at 81.  The Court also gave Fishman's proposed instruction on the good faith defense, which stated in part:

> A PERSON WHO ACTS, OR CAUSES ANOTHER PERSON TO ACT, ON A BELIEF OR AN OPINION HONESTLY HELD IS NOT PUNISHABLE UNDER THE STATUTE MERELY BECAUSE THE BELIEF OR OPINION TURNS OUT TO BE INACCURATE, INCORRECT, OR WRONG.  AN HONEST MISTAKE IN JUDGMENT OR AN HONEST ERROR IN MANAGEMENT, DOES NOT RISE TO THE LEVEL OF CRIMINAL CONDUCT.  HOWEVER, A DEFENDANT'S HONEST BELIEF THAT A VENTURE WILL ULTIMATELY SUCCEED DOES NOT CONSTITUTE GOOD FAITH IF, IN CARRYING OUT THE PLAN, HE KNOWINGLY USES FALSE REPRESENTATIONS OR PRETENSES WITH INTENT TO DECEIVE.

WHILE THE TERM "GOOD FAITH" HAS NO PRECISE DEFINITION, IT ENCOMPASSES, AMONG OTHER THINGS, A BELIEF OR OPINION HONESTLY HELD, AN ABSENCE OF MALICE OR ILL WILL, AND AN INTENTION TO AVOID TAKING UNFAIR ADVANTAGE OR ANOTHER.

Id. at 83-84. The Court declined to give an instruction proposed by Fishman's counsel suggesting that the sale of historical bonds was not per se illegal, but counsel was permitted to raise this issue during his closing argument. Dkt. # 379, at 17-18. Monroe made a closing argument on behalf of Fishman, which lasted approximately one hour. Dkt. # 286, at 3.

The jury convicted Fishman and Thornburgh of both charges in the second superseding indictment. Fishman renewed his motion for judgment of acquittal following trial, and asked the Court to set aside the jury's verdict and enter a judgment of acquittal as to one or both counts of the second superseding indictment. Fishman's motion was denied. Dkt. # 313. A presentence investigation report (PSR) was prepared. The offense level for count one was 35 and the offense level for count two was 37. The counts grouped and defendant's guideline range was calculated using a total offense level of 37 and criminal history category of III. Under the United States Sentencing Guidelines, defendant's advisory guideline range was 262 to 327 months. Fishman's attorney filed a motion for variance and a sentencing memorandum. Fishman requested a downward variance to a sentence of probation based on his mother's health and his history of cooperating with law enforcement. Dkt. # 315. The government filed a response outlining Fishman's repeated involvement in fraudulent schemes and his key role in the criminal conduct in this case, and argued that a sentence within the advisory guideline range was appropriate.

Fishman's sentencing hearing was held on October 23, 2009. Defendant objected to the use of the 2008 Sentencing Guideline Manual, but the Court overruled his objection. Dkt. # 356, at 15-17. Defendant claimed that the PSR should not have included facts concerning his involvement with

Zacaggnino, but the Court found that this objection was moot because these facts did not affect the calculation of defendant's sentence.  Id. at 18.  Defendant argued that he should not be held responsible for the total loss amount because he was not a signatory on Caribou Capital's accounts and he received only a nominal amount of the funds derived from the scheme.  Id.  The Court rejected this argument, because defendant was charged as a member of a conspiracy and he was accountable for the "acts of others [that] were reasonably foreseeable to the defendant in connection with that criminal activity."  Id.  Defendant objected to a two level enhancement for sophisticated money laundering as to count two, because he was not personally involved with Caribou Capital's accounts.  Id. at 19.  The Court found that the money laundering conspiracy involved the use of sophisticated means, such as shell corporations and other fictional entities, and defendant engaged in conduct in furtherance of the money laundering conspiracy.  Id.  Defendant sought a reduction for acceptance of responsibility, even though he exercised his right to a jury trial, because he voluntarily testified before the grand jury and provided substantial assistance to the government.  Id.  However, defendant repeatedly denied his guilt and he put the government to its burden of proof, and he was not eligible for a reduction of his offense level based on acceptance of responsibility.  Id. at 20.  Finally, argued that he should receive an adjustment for his minimal role in the offense, because he did not personally engage in transactions on behalf of Caribou Capital.  Id.  The Court found that defendant was an integral part of the fraudulent schemes and he worked closely with the other conspirators, and he was not entitled to an adjustment based on his role in the offense.  Id. at 20-21.  Defense counsel and defendant each made statements in support of defendant's request for a sentence of probation, and counsel for the government requested a sentence at the high end of the advisory guideline range.  Id. at 23-33.  The Court considered defendant's

arguments in support of his request for a variance, but the Court concluded that a sentence within the advisory guideline range was appropriate.  Id. at 34-37.  The Court found that a sentence at the low end of the advisory guideline range would be sufficient, and defendant was sentenced to 262 months imprisonment.  Defendant was also ordered to pay restitution in the amount of $3,684,213 and he received a three year term of supervised release upon his release from prison.

Fishman appealed his conviction and sentence to the Tenth Circuit Court of Appeals. Monroe initially represented Fishman on direct appeal, but Fishman became dissatisfied with Monroe and Jimmy Lance Hopkins was appointed as substitute appellate counsel.  Dkt. # 422. Monroe filed the opening appellate brief and Hopkins filed a reply brief.  See Dkt. # 462, at 12 n.5. Fishman requested leave to proceed pro se and to file his own reply brief, and his requests were granted.  Id.  Hopkins' reply brief was stricken and Fishman's pro se reply brief was made part of the appellate record.   Id.  Fishman challenged the sufficiency of the evidence to sustain his convictions for conspiracy to commit mail or wire fraud and money laundering.  The Tenth Circuit rejected his arguments and characterized Fishman as "the neural glue of the conspiracy."  Id. at 19. The Tenth Circuit also rejected Fishman's argument that the evidence presented at trial was at variance with the allegations of the second superseding indictment.  Id. at 24-29.  Fishman argued that the statute of limitations expired before the original indictment was filed, but the Tenth Circuit found that conspiracy continued well into the limitations period and that the conspirators did not voluntarily abandon the conspiracy before 2002.  Id. at 30-33.  Fishman challenged the calculation of his advisory sentencing guideline range and the amount of restitution, but the Tenth Circuit found Fishman's arguments so vague that it could not rule on the arguments.  Id. at 36-37.  Finally, the Tenth Circuit considered Fishman's argument that a violation of the Ex Post Facto Clause occurred,

because the mail and wire fraud conspiracy statute, 18 U.S.C. 1349, was not enacted until 2002. This argument was not raised before this Court and the argument was reviewed for plain error. Id. at 37. The Tenth Circuit found sufficient post-enactment evidence to sustain Fishman's conviction for conspiracy to commit wire or mail fraud, and Fishman's convictions and sentence were affirmed. Id. at 43.

The Tenth Circuit's decision was entered on May 27, 2011, and defendant filed a petition for writ of certiorari with the United States Supreme Court. The petition was denied on January 9, 2012. On October 3, 2012, defendant filed a motion to dismiss the indictment (Dkt. # 477) in the United States District Court for the Central District of California. The motion was construed as a § 2255 motion and transferred to this Court. Dkt. # 479. This Court notified defendant that it intended to construe defendant's motion (Dkt. # 477) as a § 2255 motion, and the Court gave defendant the opportunity to withdraw his pending motion or file an amended motion containing all of his claims. Dkt. # 481. Defendant elected to withdraw his motion to dismiss and, on October 29, 2012, he filed an amended § 2255 motion (Dkt. # 491). The government has filed a response (Dkt. # 496), and defendant has filed a reply (Dkt. # 501). Defendant's § 2255 motion was filed within one year of the date his convictions became final and the motion is timely under § 2255(f)(1).

## II.

Defendant asserts twelve substantive claims (grounds one through twelve) and two claims of ineffective assistance of counsel. As to defendant's ineffective assistance of counsel claims, he asserts one claim (ground thirteen) challenging the performance of trial counsel for failing to allow defendant to testify at trial, and he asserts a second ineffective assistance of counsel claim (ground fourteen) challenging appellate counsel's failure to raise each of his substantive claims on direct

appeal. The government responds that defendant's substantive claims are procedurally barred, because the claims were raised on direct appeal and were rejected or defendant could have raised the claims on direct appeal but failed to do so. As to the ineffective assistance of appellate counsel claim, the government responds that the underlying arguments asserted by defendant are meritless and defendant cannot show that his appellate attorney was ineffective for failing to raise any of the claims on appeal.

The government argues that defendant is procedurally barred from raising many of the claims alleged in his § 2255 motion because they were not raised on direct appeal. Tenth Circuit precedent is clear that "[s]ection 2255 motions are not available to test the legality of matters which should have been raised on direct appeal." United States v. Warner, 23 F.3d 287, 291 (10th Cir. 1994). Criminal defendants may not use § 2255 motions as a substitute for a direct appeal, and failure to raise an issue at trial or on direct appeal creates a procedural bar. United States v. Cervini, 379 F.3d 987, 990 (10th Cir. 2004); United States v. Barajas-Diaz, 313 F.3d 1242, 1245 (10th Cir. 2002). A procedural bar also arises when claims were raised on direct appeal and the claims have been considered and rejected by the appellate court. Warner, 23 F.3d at 291. Procedural default can be excused if defendant can show that cause and prejudice exist to excuse the default or that a fundamental miscarriage of justice has occurred. Barajas-Diaz, 313 F.3d at 1247. Although the Court must construe defendant's pleadings liberally, defendant bears the burden to show cause and prejudice or that a fundamental miscarriage of justice requires a court to excuse his procedural default. George v. Perrill, 62 F.3d 333, 335 (10th Cir. 1995).

The Court has reviewed defendant's § 2255 and the Tenth Circuit's decision, and many of defendant's substantive claims are procedurally barred. The claim asserted in ground two of

defendant's § 2255 motion was raised on direct appeal, and the Tenth Circuit found that the government presented evidence of defendant's involvement in the conspiracy after the enactment of § 1349 to sustain his conviction.  Dkt. # 462, at 39-42.  In grounds four and eight, defendant challenges the loss calculation used to determine his sentence, but the Tenth Circuit rejected his unsupported arguments on appeal concerning the amount of loss.  Id. at 36-37.  The Tenth Circuit similarly rejected defendant's arguments concerning the award of restitution.  Id.  As to the remaining substantive claims asserted by defendant, all of these claims could have been asserted on direct appeal and these claims are also procedurally barred unless defendant can show cause and prejudice to overcome the procedural bar.

Defendant argues that he can establish cause and prejudice to excuse the procedural default, because his appellate attorney was ineffective for failing to raise the arguments on direct appeal.  Defendant raises the same argument as ground fourteen of his § 2255 motion.  To the extent that defendant alleges certain arguments should have been raised on appeal, the Court must consider the merits of the omitted issue.  United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995).  "If the omitted issue is without merit, counsel's failure to raise it 'does not constitute constitutionally ineffective assistance of counsel.'" Id.  Thus, the Court must consider whether a reasonable attorney should raised have each of the omitted claims.  The Court will not consider claims that were expressly rejected on direct appeal but, in an abundance of caution, the Court will also consider

whether a reasonable attorney should have more clearly articulated defendant's arguments concerning the amount of loss and the restitution award.[7]

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993). A defendant can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases. Strickland, 466 U.S. at 687-88. There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688. In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Moreover, review of counsel's performance must be highly deferential. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.

To establish the second prong, a defendant must show that counsel's deficient performance prejudiced the defendant to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also

---

[7] The argument raised in ground two of defendant's § 2255 motion was expressly considered by the Tenth Circuit. In ground two, defendant argues that § 1349 is not retroactive and that he could not be convicted based on conduct before the statute was enacted in 2002. The Tenth Circuit agreed that § 1349 was not retroactive, but it found sufficient evidence post-dating the enactment of § 1349 to sustain defendant's conviction. Dkt. # 462, at 37-41. Thus, this argument was expressly considered on the merits and there can be no ineffective assistance of counsel for failing to raise this argument on direct appeal. Ground two of defendant's § 2255 motion is denied.

Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). In Glover v. United States, 531 U.S. 198, 199 (2001), the Supreme Court held that "any amount of actual jail time has Sixth Amendment significance." Thus, the prejudice prong of the Strickland test does not require that any increase in sentence must meet a standard of significance. See United States v. Horey, 333 F.3d 1185, 1187-88 (10th Cir. 2003).

## III.

### A.

Defendant argues in ground one that § 1349 is a penalty provision that does not create a substantive offense, and he argues that appellate counsel was ineffective for failing to raise this issue on direct appeal because he claims that he could not have been convicted of a crime under § 1349. Dkt. # 491, at 21-33; Dkt. # 501, at 11-14. Section 1349 provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." This statutory language is virtually identical to § 1956(h), which makes it a crime to conspire to commit money laundering and other related offenses. 18 U.S.C. § 1956(h). In Whitfield v. United States, 543 U.S. 209 (2005), a defendant argued that he could not have been convicted of a conspiracy offense under § 1956(h), because § 1956(h) was merely a penalty provision that did not create a new substantive offense. Id. at 214. The Supreme Court rejected this argument and determined that Congress plainly and unambiguously created a substantive offense when enacting § 1956(h). Id. at 215-17. Section 1956 is analogous to 21 U.S.C. § 846, the federal drug conspiracy statute, and the Supreme Court stated that § 846 "indisputably created an offense." Id. at 215. Other courts have applied the reasoning of Whitfield to § 1349 in rejecting arguments that § 1349 is merely

a penalty provision that does not create a substantive offense.  <u>United States v. Anderson</u>, 558 F. App'x 454, 461 (5th Cir. Mar. 17, 2014); <u>United States v. Mosberg</u>, 886 F. Supp. 2d 275 (D.N.J. 2011); <u>United States v. Tepoel</u>, 2008 WL 4554926 (W.D. Wis. Feb. 27, 2008).  Defendant cites no authority to the contrary.  This Court finds the reasoning of <u>Whitfield</u> applicable to § 1349 and there is no doubt that Congress intended to create a new substantive offense, rather than just a penalty provision, when enacting § 1349.  The Court finds that appellate counsel had no obligation to raise this meritless argument on direct appeal.

> **B.**

In ground three, defendant asserts that he could not be convicted under § 1956(h) for joining a conspiracy to violate § 1349, and his conviction under § 1956(h) should be vacated.  Dkt. # 491, at 40; Dkt. # 501, at 24.  Plaintiff agrees that § 1349 is not a predicate offense for a § 1956(h) conviction, but plaintiff points out that defendant's §1956(h) conviction was based on an alleged conspiracy to commit money laundering and monetary transactions involving criminally derived property.  Dkt. # 496, at 13.  The Court has reviewed the indictment and superseding indictments, and it is clear that defendant was not charged with a violation of § 1956(h) based on an alleged conspiracy to commit wire or mail fraud.  Count two of the second superseding indictment alleges that the objects of the conspiracy to violate § 1956(h) were as follows:

1. To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, and involving property which in fact involved the proceeds of specified unlawful activity (mail fraud and wire fraud) with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

2. To knowingly engage and attempt to engage in monetary transactions affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, and derived from specified unlawful activity

> (mail fraud and wire fraud), in violation of Title 18, United States Code,
> Section 1957(a).

Dkt. # 239, at 14.  While count two references the alleged mail and wire fraud as "specified unlawful activity," both mail and wire fraud are statutorily defined as "specified unlawful activities" and whoever commits financial transactions using the proceeds of specified unlawful activity is guilty of an offense under § 1956(a)(1).  The indictment and superseding indictments properly charged defendant with an offense under § 1956(h), and defense counsel did not provide deficient performance by failing to raise this issue on direct appeal.

C.

Defendant argues in ground four that the Court improperly calculated the amount of loss in determining his sentence, because the Court "double-counted" the loss for counts one and two.  Dkt. # 491, at 44; Dkt. # 501, at 26.  He claims that the sentences for counts one and two should be grouped to avoid the double counting of the loss.  Dkt. # 491, at 46.  In ground eight of his § 2255 motion, defendant claims that the jury should have been required to determine the amount of loss, and the Court lacked the authority to increase his sentence based on any amount of loss not specifically charged in the second superseding indictment.  Id. at 54-58.  Plaintiff responds that defendant misunderstands the manner in which his sentence was calculated, because counts one and two were grouped for the purpose of sentencing and defendant's sentence was not enhanced by double-counting the same conduct.  Dkt. # 496, at 14.

In this case, defendant was charged with conspiracy to commit wire and mail fraud in violation of § 1349 and conspiracy to commit money laundering and related offenses in violation of § 1956(h).  One of the objects of the § 1956(h) conspiracy was that defendant "knowingly conduct[ed] and attempt[ed] to conduct financial transactions affecting interstate and foreign

commerce, and involving the property which in fact involved the proceeds of specified unlawful activity (mail and wire fraud)." Dkt. # 2, at 14. In other words, the amount of loss caused by the § 1349 conspiracy was directly relevant to the calculation of defendant's sentence for count two. The total loss amount caused by defendant's conduct was $18,183,859 and, with additional enhancements, defendant's total offense level for count one was 35. The same loss amount was applied to count two, but defendant received a two level reduction under United States Sentencing Guideline (USSG) § 2B1.1 because $4,057,846.26 of the loss was attributable to Caribou. PSR, at 12. The base offense level for count two was 33, but the total offense level was 37 after additional enhancements were applied. The counts were grouped and his total offense level was 37, and this resulted in an advisory guideline range of 262 to 327 months.

Construing defendant's pro se brief broadly, it appears that he is arguing that it was improper for the Court to impose any sentence exceeding the statutory maximum of 20 years (240 months) for mail or wire fraud. He argues that his sentence exceeded the statutory maximum by 22 months, because he received the statutory maximum of 240 months as to count one and an additional 22 months as to count two. Under USSG § 5G1.2(d), if the sentence for the count carrying the highest statutory maximum does not equal the total punishment permitted under the guidelines, any other sentence imposed for other counts shall be consecutive to the extent necessary to equal the total punishment. In this case, defendant received the statutory maximum sentence of 240 months as to count one, but this did not equal the total punishment under the advisory sentencing guidelines. The Court sentenced defendant to 22 months as to counts two and this sentence was consecutive to the sentence for count one. Defendant's total sentence of 262 months was the lowest sentence possible within the advisory guideline range, and the Court clearly had the authority to structure defendant's

sentence in this manner.[8]  See United States v. Lewis, 594 F.3d 1270, 1276 (10th Cir. 2010)

(affirming the district court's decision to make sentences on multiple counts consecutive to reach

a functional equivalent of a life sentence, even though a life sentence was not authorized under either

statute).  The substantive argument alleged in ground four is meritless and defense counsel did not

perform deficiently by failing to challenge the grouping of counts one and two.

Defendant also argues in ground eight that violated his Sixth Amendment right to a jury trial

by using an intended loss amount greater than the amount of loss alleged in the indictment when

calculating his sentence.  Dkt. # 491, at 54; Dkt. # 501, at 34-35.  However, the amount of loss used

to calculate defendant's guideline range is simply a sentencing factor and it does not increase the

statutory maximum, and the Court determines the amount of loss by a preponderance of the

evidence.  United States v. Willis, 476 F.3d 1121, 1131 n.3 (10th Cir. 2007); United States v.

Wilfong, 475 F.3d 1214, 1217-18 (10th Cir. 2007).  Defense counsel had no basis to argue that the

jury was required to find the amount of loss beyond a reasonable doubt, and he was not ineffective

for failing to raise this issue.

**D.**

Defendant claims that Court's restitution order is unenforceable because the Court failed to

cite the MVRA in the judgment (ground six).  Dkt. # 491, at 49; Dkt. # 501, at 29.  He also argues

in ground seven that the Court erred when it found that a restitution order was mandatory, because

restitution is a sentencing matter that is governed by the Supreme Court's decision in United States

---

[8]    This finding also disposes of defendant's claim (ground five) that the Court improperly applied the USSG by failing to group his convictions and imposing a consecutive sentence of 22 months as to count two.  Dkt. # 491, at 46.  As the Court has noted, defendant's sentences for counts one and two were grouped, and counsel could not have been ineffective for failing to argue that the sentences should be grouped.

v. Booker, 543 U.S. 220 (2005), and defendant's Sixth Amendment rights were violated by the "mandatory" restitution scheme under the MVRA. Dkt. # 491, at 51-53; Dkt. # 501, at 31. The government responds that restitution does not deal with a custodial aspect of defendant's sentence and the amount of restitution cannot be challenged under § 2255. Dkt. # 496, at 15.

Restitution is not a custodial aspect of defendant's sentence and a restitution order cannot be challenged by filing a § 2255 motion. United States v. Carpenter, ___ F. App'x ___, 2015 WL 399904 (10th Cir. Jan. 30, 2015); United States v. Shaw, 508 F. App'x 769 (10th Cir. Jan. 24, 2013).[9] Even if the Court could reach the merits of these claims, defendant would not be entitled to any relief. The PSR clearly advised defendant that restitution would be imposed under the MVRA and defendant was permitted to challenge the amount of restitution at his sentencing hearing. Defendant raised objections to the PSR but he did not challenge the amount of restitution. Dkt. # 316, 317. At the sentencing hearing, the Court advised defendant that he would be ordered to pay $3,684,213 in restitution and he did not object to the imposition of restitution or the amount of the restitution award. See Dkt. # 356, at 22. Defendant has cited no authority that a restitution order is invalid merely because the judgment does not specifically reference the MVRA, and the record is clear that defendant knew he would be ordered to pay restitution under the MVRA. Under Fed. R. Crim. P. 32, the Court "may accept any undisputed portion of the presentence report as a finding of fact," and a defendant is deemed to have waived objections not raised at the sentencing hearing. United States v. Hooks, 551 F.3d 1205, 1217 (10th Cir. 2009). When the PSR sets forth facts used to calculate the award of restitution and the defendant raises no objection, the district court is not

---

[9]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

required to engage in any additional fact finding and it would be error for the district court to decline to order restitution. United States v. Barton, 366 F.3d 1160 (10th Cir. 2004). In this case, defendant waived any challenge to imposition or amount of restitution and restitution was properly included in the judgment. As to defendant's argument that the Court erred by finding that restitution is mandatory rather than advisory, restitution is not considered a criminal penalty and the Sixth Amendment is not implicated by a restitution order, and Booker does not apply to restitution orders. United States v. McNair, 605 F.3d 1152, 1223 (11th Cir. 2010); United States v. Westover, 435 F.3d 1273, 1277 n.5 (10th Cir. 2006); United States v. Visinaiz, 428 F.3d 1300, 1316 (10th Cir. 2005).[10] The Court lacks jurisdiction to reach the merits of grounds six and seven of defendant's § 2255 motion and, even if the Court could hear the claims, defense counsel's conduct was not constitutionally deficient for failing to raise these arguments on direct appeal.

### E.

In ground nine of his § 2255 motion, defendant claims that his offense level should have been reduced by three levels under USSG § 2X1.1(b)(2). Dkt. # 491, at 59; Dkt. # 501, at 37. Plaintiff responds that defendant and his co-conspirators completed all or substantially of the acts necessary to complete the substantive offenses of mail and wire fraud, and this three level reduction did not apply. Dkt. # 496, at 17.

Defendant was convicted of conspiracy to commit mail or wire fraud under § 1349, and the applicable sentencing guideline for this statute is § 2X1.1. However, to determine the base offense level, the guideline for the substantive offense is applied. The sentencing guideline for the

---

[10] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

substantive offense of mail or wire fraud is USSG § 2B1.1, which provides a base offense level of

7.  Defendant's offense level was increased by 28 levels based on the amount of loss, the number

of victims, and the international scope of the conspiracy, and his total offense level for count one

was 35.  Defendant claims that he should have received a three level reduction in the offense level

under USSG 2X1.1(b)(2), which states:

> If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator
> completed all the acts the conspirators believed necessary on their part for the
> successful completion of the substantive offense or the circumstances demonstrate
> that the conspirators were about to complete all such acts but for apprehension or
> interruption by some similar event beyond their control.

The notes to this sentencing guideline further state that "[i]n most prosecutions for conspiracies or

attempts, the substantive offense was substantially completed . . . .  In such cases, no reduction of

the offense level is warranted."  Unless the arrest occurs "well before" the defendant or a co-

conspirator has taken actions in furtherance of the conspiracy, a defendant is not entitled to a three

level reduction under § 2X1.1(b)(2).  U.S. SENTENCING GUIDELINES MANUAL § 2X1.1 cmt.

background (2008).

Defense counsel did not seek a reduction of defendant's sentence based on § 2X1.1(b)(2),

but this does not show that defense counsel's performance was deficient.  It is apparent from the

application notes and background for § 2X1.1(b)(2) that defendant was not eligible for a three level

reduction of the offense level, because the government presented substantial evidence at trial

establishing that the conspirators completed all of the acts necessary for the substantive offense.

This reduction in the offense level applies only in limited circumstances when a defendant is arrested

"well before" the conspirators act in furtherance of the conspiracy.  In this case, the conspiracy

continued many years before law enforcement became aware of the defendants actions, and the

evidence clearly shows that defendant and his co-conspirators defrauded victims of millions of dollars. Thus, defense counsel could not have made any reasonable argument that this reduction applied and defense counsel's performance was reasonable.[11]

**F.**

Defendant argues that the Court erred by giving him two criminal history points for a 1990 obstruction of justice conviction (ground ten), because the sentence was ordered to run concurrently with a sentence defendant received for mail fraud. Dkt. # 491, at 60. The government responds that the second conviction arose out of defendant's conduct while the mail fraud case was pending in the United States District Court for the Northern District of California, and there was necessarily an intervening arrest between the mail fraud and obstruction of justice convictions. Dkt. # 496, at 18.

The PSR states that defendant received a total of five criminal history points and that he was in criminal history category III. Defendant received three criminal history points for a 1990 mail fraud conviction, and he also received two criminal history points for an obstruction of justice charge that occurred while the mail fraud case was pending. According to the PSR, defendant was being prosecuted for mail fraud and defendant claimed that he was receiving death threats from the Church of Scientology while the mail fraud case was pending. The FBI placed a wiretap on defendant's telephone and determined that defendant paid another person to make scripted death threats to make it appear as if the Church of Scientology was threatening him. Defendant pled guilty to one count of obstruction of justice and he was sentenced to six months imprisonment. The

---

[11]     The Court also notes that defendant has not established prejudice from defense counsel's alleged deficient performance. Even if the Court had reduced the offense level as to count one, counts one and two were grouped and defendant was sentenced based on the higher advisory guideline range provided for count two.

sentence for his obstruction of justice conviction was ordered to run concurrently with his five year sentence for mail fraud, and the PSR states that both sentences were imposed on July 20, 1990.

Under USSG § 4A1.2(a)(2), "[p]rior sentences are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest." Even if there is no intervening arrest, the offenses are still considered separately unless "(A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day." U.S. SENTENCING GUIDELINES MANUAL § 4A1.2(a)(2) (2008). The PSR clearly shows that there was an intervening arrest. Defendant was arrested as to the mail fraud charge on July 31, 1988, and he was arrested on the obstruction of justice charge on January 27, 1989. Defendant did not object to these facts at the time of sentencing, and the Court could rely on the arrest dates stated in the PSR as undisputed facts. See Hooks, 551 F.3d at 1217. Defendant now attempts to dispute these facts and he claims that he was not arrested on either the mail fraud or obstruction of justice charges. Dkt. # 501, at 40. Defendant's allegations are not supported by any evidence, even though he has attached other evidence to his § 2255 motion and reply, and the Court properly relied on the facts stated in the PSR in determining defendant's criminal history category. Defendant has not shown that his criminal history was incorrectly calculated (ground ten) and defense counsel had no reasonable basis to object to defendant's criminal history category at the sentencing hearing.

**G.**

In ground eleven of his § 2255 motion, defendant argues that the statutes cited in the order of criminal forfeiture do not authorize forfeiture for the crimes alleged in counts one and two of the second superseding indictment. Dkt. # 491, at 62. The government responds that forfeiture cannot

be challenged under § 2255 and, even if the Court could consider defendant's arguments, forfeiture was properly imposed in this case.

On October 23, 2009, the Court entered an order of criminal forfeiture (Dkt. # 331) imposing criminal forfeiture money judgments in the amounts of $610,260 (as to count one) and $462,398.34 (as to count two) against Fishman and Thornburgh jointly and severally. The order cited 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1). In two unpublished decisions, the Tenth Circuit has suggested that claims concerning forfeiture may not be brought in a § 2255 motion. United States v. Simpson, 32 F. App'x 507, 509 (10th Cir. Jan. 30, 2002); United States v. Murphy, 1997 WL 796486 (10th Cir. Dec. 31, 1997).[12] Other courts have reached the same conclusion and have found that forfeiture does not relate to the custodial aspect of a defendant's sentence. United States v. Finze, 428 F. App'x 672, 676 (9th Cir. Apr. 2011); Anderson v. United States, 2000 WL 380081 (7th Cir. Apr. 12, 2000); United States v. Banguera, 1995 WL 449891 (5th Cir. June 30, 1995); United States v. Sperow, 2013 WL 3153997 (D. Idaho June 20, 2013); United States v. Fabian, 798 F. Supp. 2d 647, 684 (D. Md. 2011). Even if the Court could reach defendant's arguments, the Court would find that forfeiture was authorized by the applicable forfeiture statutes. Under 28 U.S.C. § 2461(c), a criminal forfeiture allegation may be included in any criminal case in which civil forfeiture is authorized. United States v. Padron, 527 F.3d 1156, 1161 (11th Cir. 2008). Civil and criminal forfeiture is authorized for mail or wire fraud. Id. Forfeiture is also appropriate as to charges of conspiracy to commit mail or wire fraud. United States v. Depue, 585 F. App'x 388 (9th Cir. 2014). The criminal forfeiture statute, 18 U.S.C. § 982(a)(1), expressly permits the

---

[12]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

imposition of forfeiture for violations of §§ 1956 and 1957, and this necessarily includes § 1956(h), the conspiracy statute providing the basis for count two of the second superseding indictment in this case. Ground eleven of defendant's § 2255 motion is not cognizable under § 2255 and, even if it were, defendant has not shown that forfeiture was erroneously imposed.

**H.**

Defendant argues that the government used the same evidence to prosecute him for counts one and two and that he has been punished multiple times for the same conduct in violation of the Double Jeopardy Clause of the Fifth Amendment (ground twelve). Dkt. # 491, at 67; Dkt. # 501, at 46. The government responds that each charge had distinct elements and different objects of the alleged conspiracy, and there was no violation of the Double Jeopardy Clause under the Blockburger test. Dkt. # 496, at 21.

In a pretrial motion to dismiss, defendant argued that the indictment violated the Double Jeopardy Clause because it was duplicitous and that he was charged with multiple crimes in a single count. Dkt. # 91. The Court rejected this argument and defendant chose not to raise this issue on appeal. Dkt. # 138, at 7. He now argues that the indictment was multiplicitous and that he was charged with the same offense in multiple counts. The Fifth Amendment's guarantee that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb," U.S. Const., amend. V, protects individuals not only from "successive prosecutions, but also [from] successive punishments for the same offense." United States v. Morris, 247 F.3d 1080, 1083 (10th Cir. 2001) (internal citations omitted). Accordingly, the United States Court of Appeals for the Tenth Circuit's "jurisprudence establishes that multiplicitous sentences violate the Double Jeopardy Clause." United States v. McCullough, 457 F.3d 1150, 1162 (10th Cir. 2006) (internal quotations omitted).

"'Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior.'" Id. at 1162 (quoting United States v. Johnson, 130 F.3d 1420, 1424 (10th Cir. 1997)). "Although multiplicity is not fatal to an indictment, multiplicitous counts which may result in multiplicitous convictions are considered improper because they allow multiple punishments for a single criminal offense." McCullough, 457 F.3d at 1162.

The issue of multiplicity arises when the defendant is charged with violations of multiple criminal statutes for the same underlying acts. When confronting such a situation, courts apply the rule of statutory construction that is described in Blockburger v. United States, 284 U.S. 299 (1932). See United States v. Greene, 239 F. App'x 431, 436 (10th Cir. 2007).[13] The Blockburger rule is often known as the "same elements test." United States v. Pearson, 203 F.3d 1243, 1268 (10th Cir. 2000). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304. "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." Id.

Each charge in this case contains distinct elements of proof and there was no violation of the Double Jeopardy Clause. At trial, the Court instructed the jury as to the elements of the conspiracy charges and the underlying offenses that were the objects of the conspiracy. Although the elements of the conspiracy charge were identical, the Court specifically instructed the jury as to the elements

---

[13] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

of the objects of the conspiracy, and the objects of the conspiracy were completely distinct in each conspiracy charge. Dkt. # 285, at 61-67, 72-77. There is no double jeopardy violation merely because an indictment charges that a defendant participated in two separate conspiracies, as long as the jury is instructed that each conspiracy was distinct and required the defendant to enter a separate agreement with his co-conspirators. United States v. Frierson, 698 F.3d 1267, 1269-70 (10th Cir. 2012). The existence of a single conspiracy or multiple conspiracies is a fact question for the jury, and the jury was instructed that each count must be considered separately. Dkt. # 285, at 25. The indictment alleges that defendant entered separate conspiracies to commit mail or wire fraud and to commit money laundering, and the jury instructions were sufficient to inform the jury that it was required to find that defendant participated in separate conspiracies. Defense counsel was clearly aware of the double jeopardy issue as he filed a motion to dismiss based, in part, on an alleged violation of the Double Jeopardy Clause. Dkt. # 91. Defense counsel chose not to argue mulitiplicity with good reason, because such a challenge to the indictment would not have been successful. Defense counsel did not provide ineffective assistance of counsel by failing to argue that the indictment was multiplicitous, in addition to duplicitous, and ground twelve of defendant's § 2255 is meritless.

## I.

In ground thirteen of his § 2255 motion, defendant claims that his attorney refused to allow him to testify at trial and he could have given testimony that would have shown that he was not an active participant in the conspiracies charged. Dkt. # 491, at 74-79. The government responds that Monroe did not forbid defendant from testifying at trial and, even if defendant can show that

Monroe's performance was deficient, defendant suffered no prejudice and he is not entitled to relief. Dkt. # 496, at 22-26.

Defendant has attached an affidavit to his § 2255 motion describing his interactions with Monroe, and he claims that he repeatedly told Monroe that he wished to testify at trial. Defendant states that he wanted to "tell the jury that [he] never knew about [co-defendants] Robert Searles and Wayne Davidson defrauding victims in Australia and New Zealand" until 2002. Dkt. # 491, at 121. Defendant asked Monroe to listen to ten hours of conversations between Fishman and Henriette in which Fishman allegedly told Henriette to "no longer attempt to derive value on [Searles'] bonds" due to a mispresentation about the ownership of the bonds. Id. at 122. He also asked Monroe to play the tapes for the jury. Id. Defendant claims that Monroe refused to allow him to testify and Monroe allegedly told defendant that he was unable to fully prepare for trial due to budget constraints faced by a Criminal Justice Act panel attorney. Id. at 122-23. Defendant's mother, Rose Fishman, was allegedly present when Monroe told defendant that he would not be permitted to testify at trial. Id. at 124. Defendant claims that he again asked Monroe on June 22, 2009 if he could testify at trial, because he wanted to explain that he tried to stop Searles' "fraudulent activities" and he intended to tell the jury about his role in instigating an investigation of Zaccagnino. Id. at 124, 127.

Monroe has submitted an affidavit (Dkt. # 496-1) and he states that he was aware that defendant expressed a strong desire to testify at trial. However, many of the matters that defendant intended to testify about were incriminating to defendant or were likely to be irrelevant and inadmissible. Dkt. # 496-1, at 1-2. Monroe denies making any statement that could have been construed as an outright refusal to allow defendant to testify, but he did have discussions with

defendant about the implications of testifying at trial. Id. at 2. He believed that they had "mutually agreed that it would be a mistake for [defendant] to testify." Id. Monroe also states that he does not remember Rose Fishman being present for any meeting with defendant, because it is not his practice to conduct client meeting in the presence of family members. Id. On July 5, 2009, defendant sent Monroe an e-mail stating that he would have liked a "chance to explain" certain matters to the jury, and he would have testified that he told investors that the bonds had collectible value only. Dkt. # 496-1, at 4-5. He claims that Henriette honestly believed in Clancy's valuation of the bonds, and Henriette and Fishman both believed that the bonds could be used as collateral for future investments. Id. at 5. He also stated that his "fear and paralysis prevented [him] from standing up for [himself]," and he was "consumed with fear — fear over what Charles McLaughlin would say or do or intimidate me." Id.

Under Strickland, defendant must first show that his attorney's performance was deficient. A defendant in a criminal case has the right to testify and an attorney may not prevent a client taking the stand. Cannon v. Mullin, 383 F.3d 1152, 1171 (10th Cir. 2004); United States v. Teague, 953 F.2d 1525, 1534-35 (11th Cir. 1992). The Court is presented with conflicting allegations concerning defendant's desire to testify at trial, and the Court cannot resolve this conflict without an evidentiary hearing. However, it is unnecessary for the Court to resolve this factual conflict if defendant would not prevail under the prejudice prong of the Strickland analysis. Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). The Tenth Circuit has specifically applied this rule in the context of claims that counsel prohibited a defendant from testifying at trial, and the Tenth Circuit has approved of disposing of such claims under the prejudice prong of

Strickland if the defendant's testimony would not have changed the outcome at trial. United States v. Gallant, 562 F. App'x 712, 718 (10th Cir. Apr. 23, 2014); United States v. Lott, F. App'x 946, 949 (Feb. 16, 2010).[14]

Defendant states that he would have testified about three general topics. First, defendant claims that he would have testified "about his lack of involvement with co-defendants [Searles], [Thornburgh], and [Davidson]." Dkt. # 491, at 75. Second, he claims that he would have testified about "the dates, times and places of any of the alleged activities and ongoing conspiracies that the [defendant] was not involved in or had no knowledge of, and when he had discovered same." Id. Finally, he states that he could have testified as to the actual or intended loss and that he "could have proven" that he had no actual knowledge of Davidson's activities. Id.

The Court has reviewed the entire trial transcript and finds that defendant cannot show that he was prejudiced by defense counsel's alleged failure to allow defendant to testify at trial. The government presented overwhelming evidence as to each of these points and defendant's testimony would not have been likely to sway even one juror in his favor. As to the first and second points, the Tenth Circuit specifically found that defendant played an integral role in the conspiracy and the government presented numerous witnesses describing their interactions with defendant. See Dkt. # 462, at 19-20 ("It simply defies belief that a reasonable juror would conclude that [defendant] could be so integrally involved in every aspect of the Caribou program and watch as months went by with no investors receiving their promised extravagant returns, and yet have no idea that the entire program was a fraudulent scheme."). Chapa testified that the Caribou Capital scheme would not have been credible without defendant's alleged expertise in historical bonds and defendant's

---

[14] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

participation in the scheme was a key selling point to potential investors. Dkt. # 372, at 107-113; Dkt. # 373, at 7-11. Actual investors testified that defendant actively encouraged them to invest with Caribou Capital and defendant's apparent knowledge of historical bonds was a key reason they chose to invest. Dkt. # 374, at 190-96; id. at 222-23; Dkt. # 375, at 159-65; id. at 212-17; Dkt. # 377, at 77-88. The evidence as to Fishman's key role in the alleged conspiracies was overwhelming, and there is no reasonable probability that any juror would have found that defendant's proposed testimony denying his involvement in the conspiracies sufficient reason to reach a different decision. In his third point, Fishman seems to be arguing that he was not directly involved with Davidson's activities in Australia and New Zealand and that he would have testified that he should not be held responsible for Davidson's conduct. Dkt. # 491, at 75. This does not tend to show prejudice for two reasons. There was testimony from at least one witness located in Australia that Caribou Capital relied on defendant's expertise to lend credibility to the proposed investment. Dkt. # 376, at 39-44. Grist admitted that she dealt primarily with Searles and Davidson, but she was clear that she thought she was investing with Caribou Capital. As the Court has noted, there was overwhelming evidence as to defendant's involvement with Caribou Capital. IRS Special Agent Beckner testified that Caribou Capital deposited investor funds from New Zealand and Australia in a bank account and that defendant received over $238,000 of these funds. Dkt. # 377, at 226-29. Even if the evidence showed that defendant had less direct participation with the conspiracy in New Zealand and Australia, he was charged as a member of a conspiracy that defrauded investors in those places and he is legally responsible for the actions of the other co-conspirators. United States v. Gordon, 710 F.3d 1124, 1164 (10th Cir. 2013) (in a conspiracy causing financial loss to others a conspirator is responsible for all reasonably foreseeable conduct

of his co-conspirators); United States v. Gallant, 537 F.3d 1202, 1240 (10th Cir. 2008) (same); United States v. Brewer, 983 F.2d 181, 185 (10th Cir. 1993) (same). Defendant's proposed testimony about his lack of involvement with the conspiracy in New Zealand and Australia would not have tended to negate his legal responsibility for the conduct of his co-conspirators, and the proposed testimony would have been largely irrelevant. Defendant's proposed testimony would not have been likely to change even one juror's decision to convict defendant, and the Court finds that defendant cannot not establish that he was prejudiced by defense counsel's alleged failure to call defendant to testify at trial.

J.

Defendant's final ground for relief (ground fourteen) is that his appellate attorneys were ineffective for raising all of his other arguments on direct appeal or for failing to preserve the arguments for direct appeal. Dkt. # 491, at 80-81. The Court has found that all of defendant's substantive arguments (grounds one through twelve) are meritless, and defense counsel had no obligation to raise these arguments on direct appeal. Thus, defendant has not shown that appellate counsel should have raised any of the enumerated arguments on direct appeal, and ground fourteen of defendant's § 2255 motion is denied.

IV.

The Court finds that grounds one through twelve of defendant's § 2255 were either raised on direct appeal and rejected or should have been raised on direct appeal, and defendant has not shown that a reasonable attorney would have raised the claims on direct appeal. Thus, the claims are procedurally barred, because defendant cannot establish cause and prejudice to excuse the procedural default. This finding also disposes of ground fourteen of defendant's § 2255 motion,

because ground fourteen is defendant's claim that appellate counsel was ineffective for failing to raise grounds one through twelve on direct appeal  Ground thirteen challenges the performance of trial counsel and this claim is properly raised in a § 2255 motion, but the Court has found that defendant cannot establish prejudice and that the claim should be denied.  The Court has construed defendant's <u>pro se</u> filings broadly and can discern no other arguments that should be considered.

**IT IS THEREFORE ORDERED** that defendant's amended motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Dkt. # 491) is **denied**.  A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that defendant's Motion to Supplement the Pleadings Pursuant to Federal Rule of Civil Procedure 15(d), and Section § 2255 Proceedings Rule 7 (Dkt. # 503) and Defendant Steven Fishman's Motion for Payment of Copies of Court Record under the Criminal Justice Act of 1964 Pursuant to 18 U.S.C. §3006A, and Pursuant to 28 U.S.C. §753(f), and/or pursuant to 28 U.S.C. §2250 (Dkt. # 528)[15] are **denied**.

**IT IS FURTHER ORDERED** that defendant's Motion for Status on Supplemented Pleadings (Dkt. # 518) is **moot**.

**DATED** this 25th day of February, 2015.

_Claire V. Eagle_
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[15]    Defendant requests copies of two documents filed in connection with Thornburgh's pending § 2255 motion.  Dkt. # 528  However, defendant does not explain why he would need to review these documents to prepare his own arguments.  The Court has reviewed the documents (Dkt. ## 522 and 524) and finds that they would be of no assistance to defendant, and his motion for copies of these documents without payment of copying costs is denied.